**VULCAN MATERIALS COMPANY, a corporation, Plaintiff,**

v.

**UNITED STEELWORKERS OF AMERICA, AFL–CIO, an unincorporated association, et al., Defendants.**

**Civ. A. No. 68–104.**

United States District Court,
N. D. Alabama, M. D.

May 19, 1969.

---

John J. Coleman, Jr. and A. H. Gaede, Jr., of Bradley, Arant, Rose & White, Birmingham, Ala., for plaintiff.

Benjamin L. Erdreich of Cooper, Mitch & Crawford, Birmingham, Ala., for defendants.

## OPINION

GROOMS, District Judge.

This case is before the Court for decision on the merits. The evidence was heard *ore tenus*. The parties have supplied the Court with extensive and exceptionally well written briefs. These have been carefully considered. The principal authorities relied on have been analyzed in relation to the material facts presented in the evidence.

1. The plaintiff, Vulcan Materials Company, has a slag producing plant located in Gadsden, Alabama. Adjacent to this plant is the concrete producing facility of Forman Ready-Mix Company, which is located on land formerly owned by Vulcan. A strike began at Forman Ready-Mix on February 14, 1968. This strike lasted until March 15, 1968. The case arises out of that strike, which the plaintiff alleges was not confined merely to Forman and had secondary ramifications which injured its business. Damages are sought under the "secondary boycott" provisions of the Labor Management Relations Act. 29 U.S.C. § 158(b)(4)(i)(ii)(B), and § 187.

2. The specific facts surrounding the Forman strike of February 14, 1968, would not be meaningful without certain background information. This is true

in that prior to December 29, 1967, what is now Forman Ready-Mix was a part of Vulcan Materials Concrete Products Division. On that date the Concrete Products Division was sold to Forman Ready-Mix Company, a division of Kyle, Inc. Both Kyle and Forman are largely composed of former Vulcan employees. Before the sale of the concrete facility, Vulcan's slag operation supplied a limited amount of raw material slag needed in the concrete production that required slag. Likewise, after the sale Vulcan continued to supply Forman with this raw material slag.

3. In the years preceding the disposition of Vulcan's Concrete Products Division, the production and maintenance employees of Vulcan's entire Gadsden facility, both concrete and slag, had been represented by the defendants, United Steelworkers of America, AFL–CIO and Local Union No. 2176. The same collective bargaining agreement covered both sets of employees. In late 1967, this agreement was due to be renewed. Negotiations began, and during these negotiations Vulcan Materials informed the Union that its Gadsden Ready-Mix facility would be sold. The Union thereupon proposed joint negotiations between it, Vulcan, and Kyle, the prospective purchaser of the concrete facility. Vulcan, however, refused this proposal, and separate negotiations followed between Kyle and the defendants.

4. On December 31, 1967, Vulcan Materials reached a three-year collective bargaining agreement with Local Union No. 2176 covering the production and maintenance employees of its Gadsden slag processing plant. Union negotiations with Kyle continued, but no agreement was reached. The strike which began at Forman on February 14, 1968, was in support of Union demands previously made during their collective bargaining negotiations.

5. Inevitably, transfer of employees and operations from one company to the other of necessity would be attended with certain overlap and complications. Indeed, it would not be logical in a sale such as the one effected between Vulcan and Kyle to expect an instantaneous changeover of operations, and this was recognized in the informal agreement between the two respecting the interim sharing of certain work and expenses incident thereto. When Forman Ready-Mix Company began operation of the former Vulcan concrete plant in Gadsden on January 1, 1968, until the beginning of the strike on February 14, 1968, an overlap into the former Vulcan operation did occur.

6. Examples of this overlap were as follows. The concrete trucks which Forman purchased from Vulcan remained painted the traditional Vulcan color and evidenced the Vulcan symbol. The same telephone number served outside calls for both Vulcan and Forman. Employees of both companies used the same time clock, and the time cards of employees of both companies were intermingled in a common rack. Additionally, both companies utilized a common paymaster. However, each employee was paid by a check bearing identification of his respective company. Further, an interoffice telephone system operated between both plants, and the Vulcan Materials gate was used by employees of both facilities.

7. The infusion between Vulcan and Forman was also evidenced on the employee level. The truck dispatcher for Vulcan Materials also operated as dispatcher for Forman. A former employee, Mr. W. W. Spray, testified that he directed the operations of the Vulcan Materials Company's front end loader and dump trucks. Certain clerical services were intertwined. Mr. Al Harris, a salesman for Forman, appears to have continued to take orders for both companies after the sale, and Vulcan employee Anderson continued to perform functions for Forman.

8. The complaint of Vulcan Materials Company, as amended, contains two counts. In the first count Vulcan alleges that during the Forman strike members of the defendant Union picketed the access route to its Gadsden plant and "induced or encouraged" its em-

ployees to refuse to work, thus attempting to force Vulcan to cease doing business with Forman. In the second count plaintiff asserts that the defendants picketed its access route and thereby "threatened, coerced, and restrained" plaintiff with an object of causing Vulcan to cease doing business with Forman. Liability then is clearly predicated upon the "secondary boycott" concept.

9. The strike at Forman Ready-Mix began at midnight on February 13, 1968. The letter notifying Forman of the strike was signed by Mr. Jack Ryan, who was the full time International Union representative in the Gadsden area. The production and maintenance employees of Forman had voted for the strike. The strike was officially recognized by both Local Union No. 2176 and the International, United Steelworkers of America, AFL–CIO. The employees of Vulcan Materials did not participate in the voting for the Forman strike. Neither did the production and maintenance employees of Vulcan themselves vote to strike. Yet, on February 14, 1968, when the strike at Forman began, neither employees of Forman nor Vulcan reported to work.

10. The picket line supporting the Forman employee demands was established as soon as the strike began. The placement of the picket line on the access road leading into the Vulcan plant was repeatedly emphasized in the plaintiff's testimony. This was due to the fact that when the Vulcan concrete operation in Gadsden was sold to Forman separate gates along the common access road had been designated into the respective plants.[1] Vulcan's contention is that if the strike was solely against Forman, then the strike picket line should have been established solely at the Forman gate, in order not to interfere with Vulcan's business. This however was not the case, the picket line having been established on the access roadway leading into the Vulcan plant at a point where Vulcan employees would have to cross in order to get to work. That Forman employees had continued to use the Vulcan gate even after the sale of the concrete operation was the apparent justification for this placement of the picket line. Nonetheless, on February 14th Mr. Wyatt Brock of Vulcan Materials requested specifically that the picket line be moved to the Forman gate. The request was denied, and the Union continued to picket along the access route throughout the duration of the strike.

11. The Forman picket line had been established by Union members Willie McAdams and B. O. Stracener. The general mechanics of the picket line was in their realm of responsibility. Besides these general responsibilities, Stracener was also in charge of the picket roster. Both McAdams and Stracener were employees of Vulcan Materials Company; both were on the strike committee; and both had signed the Vulcan collective bargaining agreement. However, during the strike, on February 20th, Stracener shifted from Vulcan to Forman when he was rolled, by virtue of an interim agreement with the defendants respecting seniority rights as between the employees of the employers. He was then replaced as grievance committeeman on February 21st by Jack Early.

12. Being in charge of the picket line, Zone Committeeman McAdams was at the line daily. As the highest paid Union employee at either Vulcan or Forman during the strike, he was looked to for leadership at the picket line by fellow Union members. Although stating that he told Vulcan employees to go to work, McAdams also testified that he told the workers that he personally would not cross the Forman picket line. McAdams was apparently steeped in the singularity of the adjoining concrete and slag plants and could not visualize the division which the sale of the concrete plant had effectuated. Not wanting to abandon his "brothers," McAdams refused to return to work throughout

1. Employees of either could reach their place of employment through either gate.

the strike. His only overt acts to attempt to get the Vulcan employees back to work were verbal admonitions. At no time did he exercise affirmative action in order to compel Vulcan employees to return to their jobs, or set an example by going to work himself.

13. Although the specific responsibility for the conduct of the Union members at the picket line was on McAdams and Stracener, overall responsibility ultimately fell on International Representative Ryan, and the president of Local No. 2176, Dudley Brewster. Both of these men were full time salaried Union employees. Brewster was the highest officer of the Gadsden Local. At a general meeting of the Local Union on February 15, 1968, the day following the beginning of the Forman strike, Brewster advised the membership of the strike, and remarked that striking members would appreciate people stopping by the picket line for encouragement. Brewster further testified that throughout the strike he visited the picket line to see how things were going and to encourage the men.

14. Ryan likewise testified that he stopped by the picket line on several occasions. Always, he said, he urged Vulcan employees to return to their jobs, since Vulcan was not on strike. Ryan specifically testified that on the first day of the strike he asked senior Vulcan employee Red Knox to leave the picket line, realizing that Knox's presence there might be a signal to other employees not to work.

15. Besides visiting the picket line and talking to the men, Ryan also called two special Union meetings specifically relating to the Forman strike. The first of these special meetings was held on February 21, 1968. This meeting was prompted by a telegram to Ryan advising him that unless Vulcan employees returned to work, legal action would be forthcoming.

16. At the February 21st meeting Committeeman McAdams thanked each member of Forman for the support given him during the strike. He also reaffirmed his personal conviction not to cross the Forman picket line. Representative Ryan stressed that the Union was not on strike against Vulcan Materials. However, no affirmative action was taken at the meeting to compel the Vulcan employees to return to work.

17. The second special meeting of the Union was called by Ryan on February 28th. This meeting had been precipitated by an unfair labor practice charge filed by Vulcan Materials earlier that week. At the meeting Ryan advised the Vulcan employees that if they "continued to refuse to cross the picket lines of Forman Concrete, then they should sign an affidavit stating they were acting on their own and were not doing so on the advice of the Local or International Union." All of the Vulcan employees signed the affidavit which reads as follows:

> "We work at Vulcan Materials in Gadsden and belong to the same local as men at what is now called Forman Ready Mix. The local and the International have told us that we are not on strike and have a contract and should return to work. As individuals we have decided not to work."

This affidavit, as the minutes of the meeting indicate, was signed by the Vulcan employees in each other's presence after a discussion of the issues.

18. On March 4, 1968, a new gate into the Vulcan slag plant was opened. The "third gate," located above Vulcan's existing gate, was without the picket line but was in full view of it. The gate was called to the attention of the Union, but Vulcan employees refused to utilize the gate and continued to refuse to return to work.

19. Subsequently, on March 6th, Wyatt Brock of Vulcan alerted Representative Ryan to the possibility of bringing in supervisory personnel to run the Gadsden plant. Ryan responded by innuendo that to do so would cause Republic Steel in Gadsden to go down. On this same date Brock visited the Union tent erected near the picket line. During this visit

**514**

he was advised by Committeeman McAdams that Vulcan employees were not going back to work until Forman employees had reached an agreement. The Forman "brothers" would not be required to sit out the strike alone, McAdams indicated. On this same occasion Committeeman Early stated that when Vulcan wanted the strike settled it would be settled. The Vulcan employees again refused to return to work. Brock later called in two supervisory personnel from Birmingham to do minimum work at the Gadsden plant.

20. The strike at Forman Ready-Mix Company ended on March 15, 1968. At no time during the strike had a single Vulcan employee returned to work. Further, Vulcan employees throughout the strike were at the picket line assisting the Forman employees. When the Forman strike terminated, both Forman and Vulcan employees immediately returned to their jobs.

21. Neither Forman nor Vulcan was a predominant customer of the other's products. They were engaged in different businesses, which produce different products.

22. There was no interweaving or integration of the economic fortunes of Vulcan and Forman. There was no overlapping of management functions. There was no actual common control of one by the other, or common ownership.

23. Vulcan was a neutral secondary employer.

24. The strike was conducted by both the Local and the International as a joint venture, and in carrying on the strike in a manner that impinged upon the protected rights of Vulcan they cannot escape liability for damages under 29 U.S.C.A. § 187 proximately resulting from a violation of the secondary boycott provisions of the Labor Management Relations Act. 29 U.S.C.A. § 158(b) (4) (i) (ii) (B). Although claiming that they acted individually, the Vulcan employees refused in mass to go to work or to cross the picket line. Under the facts here shown to exist neither the Local nor the International can insulate itself from liability on the basis that the members were exercising their individual rights. Truck Drivers and Helpers Local Union No. 728, etc. v. N.L.R.B., 5 Cir., 265 F.2d 439.

25. Brock acting for Vulcan acquiesced in Ryan's request to be given a week to persuade the Vulcan employees to return to work.

26. No disciplinary action was taken against any of the Vulcan employees pursuant to Article XII of the constitution of the International. Section 1 of said Article provides that:

"Any member may be penalized for committing any one or more of the following offenses: (a) violation of * * * any collective bargaining agreement * * * (n) deliberately interfering with the performance of the organization's legal or contractual obligations."

Section 2 provides that upon conviction a member may be "fined, suspended or expelled."

27. Plaintiff, having been injured in its business or property by reason of an unfair labor practice, is entitled to "recover the damages by him [it] sustained * * *" Section 187. Such damages are construed to mean "actual losses sustained." Sheet Metal Workers Int. Ass'n, Loc. 223 v. Atlas Sheet Metal Co., 5 Cir., 384 F.2d 101.

28. Plaintiff is entitled to recover the reasonable cost paid to Republic Steel Corporation for removing the slag during the period of the strike. To suit its own purpose Republic spread out the slag as added fill in its storage area and thereby incurred $2,475.00 additional expense for bulldozing It treated the slag as its own, which apparently it had a right to do, since Vulcan had not accepted delivery. The expenditures which it made were made for the account of Vulcan. The rule is that in the case of injuries to property, or for breach of contract, the owner is not justified in expending more than the property or contract is worth in an effort to lessen

damages. 22 Am.Jur.2d § 169 at 239 Note 6 and cases cited. If Vulcan had owned the slag and in order to preserve it from loss on account of defendants' wrongdoing it had expended more than $16,000.00, under the rule referred to, it could recover no more than the property was worth, namely, $11,020.36, which was the price Vulcan agreed to pay Republic for the 27,633 tons involved at the rate of 43½ cents per ton. This in the Court's opinion is the maximum that the plaintiff can recover although Vulcan paid Republic more than that sum.

■ 29. Plaintiff is entitled to recover the profit on the lost sales volume of 19,895 tons at $.316 per ton, amounting to $6,286.00. Plaintiff is not entitled to recover lost profits on the 27,633 tons of slag disposed of by Republic. In the first place it didn't own this slag and was not charged for same. It is not shown that it lost any production because of its non-delivery. As soon as the strike was concluded other slag was available without any interruption in operations.

■ 30. Plaintiff cannot have both profit and expenses to which it was put in making the profit. 25 C.J.S. Damages § 46 at 760 Note 64.10. However, the Court is of the opinion that plaintiff is entitled to recover the extraordinary expense not normal to its operations, namely:

1. Extra freight charge on shipment of chemical stone from Glencoe to Republic plant in Alabama City $ 2,784.00
2. Attorney's fees 3,420.00
3. Salaries and expenses of supervisory personnel brought in from other plants to maintain plant at Alabama City 386.00
4. Rental of loader at Alabama City to replace loader placed at rail siding for shipment of chemical stone 725.00
$ 7,315.00

Plaintiff is entitled to recover these items together with the sums referred to in paragraphs 28 and 29, totalling $24,-621.36. All other claimed items of damages are disallowed.

■ 31. Defendants are not entitled to an abatement of damages based on the acquiescence of Brock in Ryan's request to be given a week to persuade the Vulcan employees to return to work. This acquiescence was based upon a *quid pro quo*. The strike was not settled, consequently the condition was not met.

A judgment will be entered in accordance with the foregoing findings and conclusions.