FRITO–LAY, INC., Plaintiff-Appellee,

v.

LOCAL UNION NO. 137, INTERNATIONAL BROTHERHOOD OF TEAMSTERS, CHAUFFEURS, WAREHOUSEMEN AND HELPERS OF AMERICA et al., Defendants-Appellants.

No. 77–2075.

United States Court of Appeals, Ninth Circuit.

July 3, 1980.

Kenneth N. Silbert, Brundage, Beeson, Tayer & Kovach, San Francisco, Cal., for defendants-appellants.

Duane C. Aldrich, Kilpatrick, Cody, Rogers & McClatchey & Regenstein, Atlanta, Ga., for plaintiff-appellee.

Before DUNIWAY and KENNEDY, Circuit Judges, and BONSAL,* District Judge.

KENNEDY, Circuit Judge:

Frito-Lay, Inc., brought suit against fifteen local unions affiliated with the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America (the "Union"), seeking monetary relief for damages suffered as a result of the Union's strike against the Company. Frito-Lay alleged the Union struck in violation of sections 8(b)(4)(A) and 303(a) of the Labor Management Relations Act ("Act"), 29 U.S.C. § 158(b)(4)(A) and § 187(a). The Union locals appeal from the district court judgment awarding Frito-Lay $688,518 in damages. Appellants challenge the trial court's interpretation of section 8(b)(4)(A) of the Act and the court's findings of fact relating to both liability and computation of damages. This court has jurisdiction under 28 U.S.C. § 1291. For the reasons set out below, we affirm the findings as to liability, and we remand for further proceedings on the issue of damages.

I

Appellee Frito-Lay manufactures, sells and distributes potato chips, corn chips and other snack food products in California and elsewhere. Granny Goose, Inc., and Laura Scudder's are competitors engaged in the same business. Appellants are local labor organizations that represent route salesmen and warehousemen employed by Frito-Lay, Granny Goose, and Laura Scudder's in Northern and Central California and part of Nevada.

Between 1960 and December 14, 1973, the three employers joined together as an employer organization to bargain for and enter collective bargaining agreements with the Union. The employer organization negotiated on behalf of the employers for five successive collective bargaining agreements with the Union, covering the period between March 1, 1960, and February 28, 1974. Before commencing negotiations for a contract to succeed the agreement set to expire on February 28, 1974, each of the three employers gave timely notice to the Union of their intent to withdraw from multi-employer bargaining and to bargain separately, thereby dissolving the multi-employer bargaining unit.[1]

On January 28, 1974, a union negotiating committee met with Frito-Lay, Laura Scud-

---

* Honorable Dudley B. Bonsal, United States District Judge for the Southern District of New York, sitting by designation.

1. Frito-Lay's decision to withdraw from the employer organization apparently was based on factors peculiar to its method of product distribution, which emphasized different methods of compensation to its salesmen from those used by the competition; it desired to emphasize commissions and to reduce base pay for its salesmen.

der's, and Granny Goose and submitted a single contract proposal to all three companies. Throughout the subsequent negotiations the Union demanded that the three companies agree either to one contract covering employees of all three companies or to separate contracts containing substantially identical provisions for each company.

During the negotiations the Union conditioned its approval of Frito-Lay's proposals upon the acceptance of those proposals by the other two companies. On four occasions the Union submitted separate contract proposals from each company to the union members for ratification. The employees of all three companies voted together on each company's proposal ("group voting"), despite each company's repeated demands that its employees alone vote on their company's contract proposals.

The Union evidently was dissatisfied with the breakup of the employer organization and frustrated by the inability to negotiate a single contract or substantially identical contracts to cover all its members. Several times during the negotiations union representatives suggested that the employers confer together to work out contract provisions that would be substantially identical for all three companies.[2]

On May 12, 1974, the Union, unable to obtain sufficiently similar contract provisions through individual bargaining, commenced a strike against all three companies. On June 3, 1974, the Western Conference of Teamsters ordered the Union to stop using the group voting procedure and allow each company's employees to vote alone on their company's contract proposal. The strike remained in effect against Frito-Lay until June 29, 1974, when Frito-Lay's employees, voting separately, ratified their company's contract proposal.

The district court concluded that the union's conduct before and during the strike, together with statements of members of the union negotiating committee, evidenced an intent to force the companies to reconstitute the employer organization and to negotiate a multi-employer contract. The court held that the Union had committed an unfair labor practice in violation of section 8(b)(4)(A) because it struck the employers to achieve this goal.

## II

### *Liability*

■ Section 8(b)(4)(A) provides, *inter alia*, that it shall be an "unfair labor practice for a labor organization or its agents . . . to engage in, or to induce or encourage any individual employed by any person engaged in commerce or in an industry affecting commerce to engage in, a strike . . . where . . . an object thereof is . . . [to] forc[e] or requir[e] any employer . . . to join any . . . employer organization." 29 U.S.C. § 158(b)(4)(A).[3]

At the outset, we must determine the scope of the prohibition in section

2. At the outset, the union negotiating committee requested that the three companies meet together with it on January 28, 1974, for the purpose of beginning negotiations. Each company, insisting on its right to negotiate separately and independently, agreed to attend the meeting only to receive the Union's initial contract proposal. During that meeting, the union negotiating committee requested that the three companies attend joint bargaining sessions with the Union, as had been the practice before the dissolution of the employer organization. The companies refused. Nevertheless, at various times during the negotiations, the negotiating committee arranged joint meetings with the three companies in an effort to negotiate identical contract language. Several times the Union negotiators expressed the "[w]ish [that] all you companies would get off your butts and get together," to come up with uniform language.

3. Section 303(b) of the Act, 29 U.S.C. § 187(b), provides that whoever shall be injured in his business or property by reason of any violation of Section 303(a) may sue in any district court and shall recover damages sustained and the costs of the suit. Section 303(a), 29 U.S.C. § 187(a), provides that it shall be unlawful for the purposes of Section 303 only, in any industry or activity affecting commerce, for any labor organization to engage in any activity or conduct defined as an unfair labor practice in, among others, section 8(b)(4)(A).

8(b)(4)(A). Appellants argue the section proscribes coercive union conduct—here a strike—when it is directed at forcing an employer to become an actual member of an existing employer association. It follows, the Union contends, that the section does not prohibit union action taken to require employers to bargain on a group basis. We disagree with the Union's limited construction of the provision.

No NLRB decision we have found reaches the boundaries of the section, as in each case where a violation of section 8(b)(4)(A) was found the Union had struck to require an employer to join an existing employer organization. *See United Mine Workers, Local 1854 (Amax Coal Co.)*, 238 NLRB No. 214 (Sept. 29, 1978); *Glass Workers Local 1892 (Frank J. Rooney, Inc.)*, 141 NLRB 106 (1963); *I. L. W. U. Local 8 (General Ore., Inc.)*, 126 NLRB 172 (1960); *United Construction Workers (Kanawha Coal Operators Association)*, 94 NLRB 1731 (1951). Although these cases all involve existing employer organizations, they do not emphasize formal membership in an existing organization as a necessary component of a section 8(b)(4)(A) violation. In *Amax Coal Co.*, for example, the president of the UMW proposed that twelve western coal mine operators form a multi-employer bargaining association to negotiate a single agreement covering their miners. Four operators agreed to the plan. One operator who rejected the proposal subsequently sued the UMW, charging violations of sections 8(b)(1)(B) and 8(b)(4)(A). The Board ignored a possible distinction between existing and nascent employer organizations and concluded only that the Union had violated section 8(b)(4)(A) by striking the dissident operator, "with the objective of forcing it to engage in multiemployer bargaining . . .." *Id.* at 15.

There is nothing talismanic about the term "employer organization." Neither the Board nor the courts have ever required that employers organize themselves into a formal association to be considered an employer organization for purposes of the Act. On the contrary, "substance rather than legalistic form is all the Board has ever required in multi-employer bargaining." *Town & Country Diary*, 136 NLRB 517, 523 (1962); *Metz Brewing Co.*, 98 NLRB 1010, 1012 (1957). To form a multi-employer group, individual employers need only express an unequivocal intention to be bound in collective bargaining by group rather than individual action. *Komatz Construction Co. v. NLRB*, 458 F.2d 317, 321 (8th Cir. 1972). No formal organizational structure is required. Recognizing the potential informality of multi-employer bargaining units, we think it unlikely that Congress sought in section 8(b)(4)(A) to prohibit a union from forcing an employer to become a formal member of an employer organization but to permit a union to force competing employers to bargain together as an informal group. Attributing that interpretation to the section would allow a union to force employers to engage in multi-employer bargaining so long as the Union did not make the mistake of requiring the employers involved to become members of a formal, existing employer organization.

Our reading of section 8(b)(4)(A) is supported by the legislative history of the Labor Management Relations Act, which indicates that Congress was concerned with forced multi-employer bargaining in general, not merely forced membership in an existing organization. As the district court aptly pointed out, *Frito-Lay, Inc. v. International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America*, 401 F.Supp. 370, 373–76 (N.D.Cal.1975), the proscription of section 8(b)(4)(A) originally encompassed all industry-wide bargaining. The bill, H.R. 3020, was amended later in a compromise measure to ban only involuntary industry-wide bargaining. But throughout the debates the focus was on industry-wide employer bargaining in general—and its perceived evils, such as crippling industry-wide strikes, collusive stifling of competition, and "shocking restraints of trade," H.R. No. 245, 93d Cong.,

2d Sess., 591 (1947)—rather than on the operation of formal employer organizations.[4] In view of the legislative history, we conclude that section 8(b)(4)(A) must be construed to prohibit coercive union conduct with the object of forcing employers to engage in multi-employer bargaining, whether as a formal association or informal group.

The Union next contends that the actions attributed to it during the negotiations constitute approved tactics in furtherance of its legitimate efforts to obtain uniform wages and working conditions. We agree that uniformity of labor standards is a legitimate union goal, *United Mine Workers v. Pennington*, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965); *American Steel Foundries v. Tri-City Central Trades Council*, 257 U.S. 184, 42 S.Ct. 72, 66 L.Ed. 189 (1921); *Utility Workers of America (Ohio Power Company)*, 203 NLRB No. 55, 83 LRRM 1099 (1973), *enf'd.*, 490 F.2d 1383 (6th Cir. 1974), and that variations of the tactics employed by the Union have been sanctioned in other contexts as devices by which to achieve that goal. Specifically, courts in coalition bargaining cases have upheld group voting among the employees in separate units where the working conditions negotiated in one unit may substantially affect the working conditions of the other units.[5] Similarly, we can concede for the purposes of this case that a union legitimately may demand contract coverage of jobs not currently in existence if those jobs may at a future date exist and be within the bargaining unit. *See International Typographical Union, Local 38 v. NLRB*, 278 F.2d 6, 11 (1st Cir. 1960), *aff'd in part and rev'd in part*, 365 U.S. 705, 81 S.Ct. 855, 6 L.Ed.2d 36 (1961). We think also that the Union's practice of presenting one company with concessions agreed to by another company—and accepting one company's proposal subject to its acceptance by the other companies—may be said to fit within a broad definition of "whipsawing,"[6] an accepted labor tactic designed to achieve uniform economic terms and conditions. *Cf. NLRB v. Truck Drivers Local 449 (Buffalo Linen Supply Co.)*, 353 U.S. 87, 77 S.Ct. 643, 1 L.Ed.2d 676 (1957); *NLRB v. Hart*, 183 NLRB No. 100, *enf'd.*, 453 F.2d 215 (9th Cir. 1971); *NLRB v. EZ Davies Chevrolet*, 395 F.2d 191 (9th Cir. 1968).

Although the cases cited to us as support for these propositions are distinguishable on their facts from the present dispute, taken together they confirm the general proposition that the tactics described are acceptable collective bargaining techniques when the Union employs them to achieve a legitimate goal, such as uniformity in working conditions. Thus, group voting, insistence on parallel contract terms for the same or commensurate job classifications, and conditional acceptance of contract proposals do

---

**4.** The Union suggests that, because it never made an express demand that the employers bargain as a multi-employer group, it therefore cannot be held to have violated § 8(b)(4)(A). The logic of this argument eludes us. Suffice it to say that an express demand to join in multi-employer bargaining has never been considered a necessary component of a section 8(b)(4)(A) violation. As the Board stated in *General Ore*, 121 N.L.R.B. at 173, "It does not matter that their objectives were not formulated by the Respondents as a demand. The parties well understood what alternative action was expected of the Company as a condition of the cessation of the picketing, without the necessity of formulating the specific demand."

The tactics of the Union, its demand for uniform contracts, its suggestions of joint meetings with the three companies, and the context of the prior bargaining history are all strong evidence of the Union's objective.

**5.** It is plausible that employees in this snack food industry would be affected by a contract settlement with any individual company, and all would have an interest in voting on each proposal.

**6.** A "whipsaw strike," by common understanding, is a strike against only one member of a multi-employer bargaining unit in an attempt by the use of economic pressure to force that member and each subsequent member to come to an agreement separately. *NLRB v. Truck Drivers Local Union No. 449*, 353 U.S. 87, 90 n.7, 77 S.Ct. 643, 644, 1 L.Ed.2d 676 (1957).

not in themselves constitute illegitimate labor tactics.

■ Tactics such as those described above, however, although innocent in and of themselves, can in context become part of an illegal overall pattern of conduct. Assertions of a goal of uniformity in instances such as this may mask illegitimate union motives. *Utility Workers, supra,* 83 LRRM at 1103; *NLRB v. General Electric Co.,* 418 F.2d 736, 760 n.15 (2d Cir. 1969), *cert. denied,* 397 U.S. 965, 90 S.Ct. 995, 25 L.Ed.2d 257 (1970); *NLRB v. Insurance Agents' Union,* 361 U.S. 477, 506, 80 S.Ct. 419, 436, 4 L.Ed.2d 454 (1960). There is a violation of section 8(b)(4)(A) if, on the basis of all the evidence, the court determines that a substantial purpose of the Union is to force the companies into a multi-employer bargaining unit and the otherwise lawful tactics are being employed in support of that purpose. Although inquiry into the Union's motives and objects is made difficult by problems of proof, the inquiry is a commonplace component in the adjudication of labor disputes. The same problems of proof exist in the context of union picketing, *see, e. g., Brotherhood of Railroad Trainmen v. Jacksonville Terminal Co.,* 394 U.S. 369, 386–90, 89 S.Ct. 1109, 1119–1122, 22 L.Ed.2d 344 (1969); *Electrical Workers, Local 761 v. NLRB,* 366 U.S. 667, 673–74, 81 S.Ct. 1285, 1289–90, 6 L.Ed.2d 592 (1961); *Carpenters Local 470 v.*

*NLRB,* 564 F.2d 1360, 1362 (9th Cir. 1977), refusals to bargain in good faith, *see NLRB v. Katz,* 369 U.S. 736, 738, 82 S.Ct. 1107, 1109, 8 L.Ed.2d 230 (1962); *NLRB v. Insurance Agents' International Union,* 361 U.S. 477, 80 S.Ct. 419, 4 L.Ed.2d 454 (1960); *NLRB v. Tomco Communications, Inc.,* 567 F.2d 871 (9th Cir. 1978); *cf. NLRB v. Gissel Packing Co.,* 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969) (objective criteria preferable to inquiry into employer's subjective state of mind at time of employer's refusal to recognize a union), and employer discharge of union employees. *See NLRB v. Great Dane Trailers, Inc.,* 388 U.S. 26, 87 S.Ct. 1792, 18 L.Ed.2d 1027 (1967); *NLRB v. Erie Resistor Corp.,* 373 U.S. 221, 83 S.Ct. 1139, 10 L.Ed.2d 308 (1963); *NLRB v. Mrak Coal Co.,* 322 F.2d 311, 313 (9th Cir. 1963); *NLRB v. Cascade Empire Ass'n Inc.,* 296 F.2d 42 (9th Cir. 1961).

■ Upon review of the record made at trial, we conclude there is substantial, although not overwhelming, direct evidence to support the district court's finding of illegal motive and that its findings are not clearly erroneous. The record shows the Union's members were sorely disappointed by the breakup of the multi-employer group and that the Union tried to perpetuate past practices by negotiating a single contract for all companies or three uniform contracts.[7] At several points during the nego-

---

7. For example, during a pretrial deposition the following colloquy ensued between defense counsel and Ralph J. Torrisi, one of the Union's chief negotiators:

  "Q: As I understand what you said earlier, it was the sense of the membership that they preferred to keep things as they had been, that is, the industry would bargain as a whole and operate under the same provisions.

  "A: That's what they wanted. Yeah, they had a hell of a hill to climb and get over that.

  "Q: I think you also indicated that—related to that that the membership was deeply unhappy about the attempt to break up the multi-employer group?

  "A: They were deeply unhappy on being notified that it had been broken up.

  "Q: That's what I meant, yeah. I mean you were faced with a lot of unhappiness among your membership about that issue.

  "A: Yes."

This statement was corroborated by another union negotiator, Harry Marashian:

  "Q: Wasn't there some concern on the part of the Negotiating Committee over the break-up of the prior multi-employer group?

  "A: There was concern. They were concerned."

Marashian also stated:

  "A: Always been a multi-bargaining group in the past, so this is why we bargained multi-group. It's been past practice so far as I can recall.

  "Q: And the Negotiating Committee wanted to continue the past practice?

tiations the Union negotiators suggested that the employers "get together" to come up with common contracts, and went so far as to arrange joint bargaining meetings to be attended by all three employers simultaneously.[8] Finally, and most significantly, statements by union negotiators support the district court's finding that part of the Union's strategy was to persuade the companies to reinstitute the old employer organization, and that the tactics in question were designed to accomplish that goal.[9] The intent inferable from this testimony taints the more ambiguous activities of group voting, demands for inapplicable and uniform conditions, and conditional acceptance of contract provisions.

The context and history of the negotiations here further support the district court's conclusion that the Union intended to force multi-employer bargaining. For fourteen years the Union had negotiated with the multi-employer group and signed collective bargaining agreements that the Union apparently found satisfactory. Through multi-employer bargaining the Union was able to achieve absolute uniformity of wage rates and working conditions. Multi-employer bargaining enabled the Union to know precisely the rates and conditions for each employer in the area. We conclude that a past history of successful multi-employer bargaining, coupled with direct evidence of union intent to continue bargaining on a multi-employer basis and resort to coercive tactics designed to implement that intent, establish an overall pattern of conduct supporting the district court's finding of an illegal union objective to force multi-employer bargaining.

■ Appellants argue that the district court has improperly equated an unlawful object with a potential effect of the Union's negotiating strategy. We agree that where certain tactics are susceptible of innocent as well as illegal interpretation a court should hesitate to infer an illegal object based upon nothing more than mere conduct and its effects. In such cases we do not infer intent merely from the foreseeable effect of such tactics. *Cf. Electrical Workers, Local 761 v. NLRB*, 366 U.S. 667, 673–74, 81 S.Ct. 1285, 1289–90, 6 L.Ed.2d 592 (1961) (picketing that induces secondary employees to respect a picket line held not the equivalent of picketing where the object is to induce those employees to engage in concerted conduct against their employer in order to force him to refuse to deal with the struck employer); *National Woodwork Manufacturers Association v. NLRB*, 386 U.S. 612, 87 S.Ct. 1250, 18 L.Ed.2d 357 (1967). The preceding discussion makes it clear, however, that the court did not rely solely on the effect of the Union's conduct to establish the illegitimate motive.

Appellants further assert that even if the Union had an illegal object during negotiations, it abandoned that object prior to the strike when it withdrew its demand for identical contract provisions among the three companies. The evidence, however, supports the district court's finding that the Union's illegal motive continued up to and during part of the strike.

On May 1, 1974, the Union advised the three employers that it would consider contract proposals with separate compensation systems tailored to the needs of each individual employer, provided that all compa-

---

"A: Yes, sir."

**8.** *See* note 2, *supra.*

**9.** For example, Marashian admitted the following:
"Q: Wasn't it the desire of the Negotiating Committee that the multi-employer group remain in existence during these negotiations?
"A: Right.
"Q: And was part of the strategy of the Negotiating Committee to persuade the employers to re-form the multi-employer group to negotiate the new contract?
"A: As I recall, yes.
"Q: Was it also part of the strategy of the Negotiating Committee to use group voting in order to persuade the employers to re-form the multi-employer group?
"A: Yes, that was."

nies would agree to an identical guaranteed percentage increase of annual wages. After reaching a settlement agreement with Granny Goose on May 3, the union negotiating committee presented the Granny Goose settlement agreement to Laura Scudder's and Frito-Lay on May 7 and 8, and insisted that Laura Scudder's and Frito-Lay accept it. When asked by company negotiators whether it would recommend the Granny Goose proposal to the membership, the union negotiator stated that he would not recommend it unless he could obtain corresponding uniform contracts from the other employers.

Frito-Lay was told that it would have to agree to the Granny Goose settlement except in the area of wages, and even in the area of wages it would have to accept identical provisions regarding guaranteed increases. On May 10, two days before the strike, the union negotiator gave notice that language Frito-Lay proposed was not sufficiently uniform in light of the Granny Goose agreement and that a strike over common language appeared imminent. The strike commenced on May 12.

Appellants contend that because they were willing to allow the possibility of separate compensation systems in the week prior to the strike, there was no demand for a uniform contract and no requirement of multi-employer bargaining.

However, the Union did not submit the proposed Granny Goose agreement to its members for a vote, and its willingness to allow the possibility of separate compensation systems was so grudging as to permit a conclusion that it was not genuine. The Union persisted, moreover, in its tactics (1) of group voting (until ordered to desist by the Western Regional Conference of Teamsters), and (2) of demanding in all three contexts the inclusion of provisions that were inapplicable to some employers.

The evidence supports a finding that the Union's illegal purpose was a substantial cause of the strike. We think, however, that the improper purpose was abandoned

on June 7, 1974, so that the Union's liability ceased after that day. We discuss this conclusion below.

## III

### Damages

Frito-Lay requested $559,500 in lost profits and $148,000 in extraordinary expenses. The district court awarded the company $554,154 in lost profits and $134,364 in extraordinary expenses. The parties contest four aspects of damages: (1) the period of time for which damages should be assessed—the entire duration of the strike or some shorter period; (2) the method that the court should adopt to estimate Frito-Lay's lost sales during the strike; (3) several elements Frito-Lay claimed as "fixed expenses," (recoverable as unavoidable losses) which the Union contends should properly be viewed as variable costs (not recoverable); and (4) certain expenses claimed as "extraordinary."

### A. Duration

In *Mead v. Retail Clerks Local 839*, 523 F.2d 1371 (9th Cir. 1975), we held that "when a union exerts economic pressure to achieve both lawful and unlawful objectives and the consequences were not separable, damages cannot be recovered unless the unlawful objective was a substantial cause of the pressure." 523 F.2d at 1374. Appellants claim that the underlying object of the strike was lawful—to obtain increased economic benefits for its members—even though the attempt to force multi-employer bargaining was unlawful. They argue that to recover damages Frito-Lay must either (1) distinguish between the effects of the legal and illegal objectives, or (2) if those effects are not separable, establish that the strike would not have occurred absent the illegal objectives.

*Mead* does not require that the illegal object be the sole cause of the strike, only that it be a "substantial" cause or that

it "materially contribute" to the injury, "notwithstanding other factors contributed also." 523 F.2d at 1376–77. The Union's argument misapprehends the principles applicable to proof of causation in cases such as this. The controlling rules derive from tort law principles where more than one factor can be a substantial cause, and no single factor need be the sole causative element. Here the district court properly found the illegal objective to be at least a substantial—if not the sole—cause of the strike; from this the court could reasonably infer a causal relationship between the illegal objectives and the damages attributable to the strike.

■■■■ A case may arise in which an illegal object gives such momentum to a strike that the effects of the wrongful conduct last beyond the time when the Union renounces the illegal object and confines its demands to lawful purposes. There is a certain cadence to collective bargaining negotiations, both before a strike is called and while it continues. In the usual case, a strike occurs after a period of bargaining and after other, less coercive means of persuasion have failed. By then, an illegal demand may have become closely entwined with legitimate ones. A strike cannot, therefore, be viewed in isolation from the bargaining that surrounds it. If an illegal demand is a substantial cause of continuing the strike even beyond the point when the demand is renounced, we do not foreclose the possibility that a union may be held liable for the injuries so caused. A union may not escape liability for pursuing an illegal object by renouncing it if the effects of an illegal demand nevertheless continue. In the case before us, however, there was no explicit finding that the illegal object pursued by the Union was a substantial cause of the strike's continuance after that object was abandoned. On this record, moreover, we think the evidence is clear that the Union's liability for the strike terminated before the date the strike ended.

On June 6, 1974, the Union accepted a separate contract with Granny Goose. This was by a separate vote of Granny Goose employees only. The Union had also offered to accept from Laura Scudder's a compensation scheme, based on high commissions on corn products, different from the Granny Goose contract and not acceptable to Frito-Lay. On June 7, the Frito-Lay employees, at a Union meeting, voted against a proposed Frito-Lay contract. After comparing the proposal with the Granny Goose contract, a negotiating committee had recommended that the Frito-Lay offer be turned down, and "that we match the Goose proposal, or at least ask." The recommendation was not unlawful, and it does not evidence a continuing demand that Frito-Lay join in multi-employer bargaining. All it shows is a demand for further bargaining securing the terms of the Granny Goose contract as an objective.

The events of June 6 and 7 show an abandonment of the unlawful objective and a retreat to the lawful objective of obtaining, in a separate contract, terms as close to those of the Granny Goose contract as bargaining and the strike could compel Frito-Lay to accept. The abandonment should have been apparent to the employer when it occurred, and it cannot be said that either side was any longer affected by the illegal object previously pursued by the Union. We hold that the unlawful purpose of the strike was effectively abandoned on June 7, 1974, and that after June 7 the strike was lawful. The Union is not liable for damages caused by the strike after June 7.

### B. Calculation of Damages

The parties agreed on the following approach in calculating Frito-Lay's lost profits: (1) estimation of lost sales; (2) computation of variable expenses as a percentage of total sales; and (3) deduction of the appropriate amount of variable expenses not incurred from the sales not made.

■■■ Appellants still challenge the specific method used by the district court to compute Frito-Lay's lost sales, claiming

**1364**

that this method overstates those losses. This contention is without merit. In adopting the method proposed by Frito-Lay,[10] the district court estimated lost sales by comparing the prestrike sales volume in the division affected by the strike with the volume in other California divisions. It then arrived at a projected growth rate for the affected division and computed the value of lost sales. Appellants argue that this comparison is invalid because it ignores the asserted facts that growth rates are a function of sales volume and that growth rates diminish when sales within a division reach a certain level. Appellants suggest that Frito-Lay should have relied on its own market estimates of growth rate for the San Jose division determined by the Company long before the strike.

We begin with the proposition that once an employer has proved that he has suffered some injury to his business or property, "he need not detail the exact amount of damages suffered; it will suffice if the evidence shows the extent of damages as a matter of just and reasonable inference, although the result may be only approximate." *Gulf Coast Building and Supply Co. v. Electrical Workers, Local 480*, 428 F.2d 121, 125–26 (5th Cir. 1970); *see also Story Parchment Co. v. Patterson Parchment Paper Co.*, 282 U.S. 555, 51 S.Ct. 248, 75 L.Ed. 544 (1931). As a corollary to this rule, we will not review on appeal the merits of various methods of calculation, so long as the method actually employed by the district court is designed to yield a reasonable approximation of damages. We are convinced that the method used in this case is reasonable. Particularly supportive of this conclusion is the observation that the three divisions being compared generally promote the same items at the same time and are similar to each other in other ways. The absolute sales volume figures were approximately the same during the four periods

preceding the strike for the affected division and the other California divisions.

■ Appellants next contend that certain selling expenses designated by Frito-Lay as fixed (and therefore recoverable) are in fact variable costs that must be deducted from lost sales. They argue that bonuses paid to district sales managers should be designated as variable because they vary with sales volume. Similarly, they challenge salaries paid to secretaries and clerical workers whose workloads would have been substantially reduced by the strike, making employment of several individuals unnecessary during the strike. Rather than characterizing these costs as fixed or variable, we believe they are recoverable as justifiable expenses to minimize the damage caused by the strike. Payment of the bonuses was designed to retain experienced management personnel who would be likely to leave if their salaries were decreased because of the strike. Similarly, Frito-Lay acted reasonably in retaining members of the secretarial and clerical staff, since the company had no way of knowing when the strike would end. It reasonably maintained a standby posture for resuming full operations as soon as the strike halted, thus to minimize business losses. *See W. L. Mead, Inc. v. Teamsters, Local 25*, 129 F.Supp. 313 (D.Mass.1955), *aff'd*, 230 F.2d 576 (1st Cir. 1956).

■ Appellants also challenge the depreciation taken on certain Frito-Lay vehicles and production machinery. They contend that in fact this equipment was not depreciating during the strike period because it remained idle. Frito-Lay calculated the amount of depreciation involved on the straight-line basis it uses for bookkeeping and tax purposes. We believe that even though the equipment was idle during the strike, some depreciation is allowable as a

**10.** Although the district court did not specify the method by which it calculated damages, *Robey v. Sun Record Co.*, 242 F.2d 684 (5th Cir.), *cert. denied*, 355 U.S. 816, 78 S.Ct. 20, 2 L.Ed.2d 33 (1957), it is evident that it adopted Frito-Lay's basic framework for calculating lost sales.

fixed expense. *See Huffman Towing, Inc., v. Mainstream Shipyard and Supply, Inc.,* 388 F.Supp. 1362 (N.D.Miss.1975); *Noranda Aluminum, Inc. v. United Brotherhood of Carpenters and Joiners of America, AFL–CIO,* 382 F.Supp. 258 (E.D.Mo.1973). We think, moreover, the straight-line method a reasonably accurate approximation of depreciation for these purposes.

We do agree with appellants that certain expenses claimed by Frito-Lay must be deducted from the lost sales figure. First, the record indicates that certain tractors and trailers for which Frito-Lay claimed depreciation during the strike were actually transferred to Los Angeles and used there for profit-making activities. Frito-Lay is not entitled to recover depreciation for any vehicles so employed because depreciation on that equipment is not an expense chargeable to the San Jose traffic center, but rather an expense chargeable to the Los Angeles center. Because the equipment was used in Los Angeles for profit-making activities, the company cannot claim this depreciation as a loss. *See, e. g., Buono Sales, Inc. v. Chrysler Motors Corp.,* 449 F.2d 715 (3d Cir. 1971). Second, Frito-Lay claimed as fixed the cost of replacement display and supply racks. Because the need for new racks varies directly with sales volume, we agree with appellants that these costs must properly be considered variable, and thus be deducted from lost sales. Finally, Frito-Lay treats as fixed several benefits it normally pays to employees, including sick pay, jury duty pay and leave of absence pay. Even though normally considered fixed, these expenses are similar to employee salaries—also considered fixed—which cannot be recovered because not paid during the strike.

The district court sitting as a trier of fact is not required to itemize the components that enter into an award of damages. *Neal v. Saga Shipping Co.,* 407 F.2d 481, 489 (5th Cir.), *cert. denied,* 395 U.S. 986, 89 S.Ct. 2143, 23 L.Ed.2d 775 (1969); *George v. United States,* 295 F.2d 310 (7th Cir. 1961); *Allen v. W.H.O. Alfalfa Mill Co.,* 272 F.2d 98 (10th Cir. 1959). Its failure to do so here, however, requires us to remand the case for reconsideration of its damage figure in light of our conclusions above.

Appellants also challenge other components of the district judge's finding regarding variable costs and extraordinary expenses. Without setting forth the items in detail, we have concluded, with the few exceptions noted above, that the findings of the district judge as to the amount of accrued and anticipated losses, lost profits, and extraordinary expenses suffered by Frito-Lay as a result of the strike were based upon substantial evidence and they cannot be held clearly erroneous under Fed. R.Civ.P. 52(a).[11]

We affirm the district court's judgment of liability, but limit it to the period of the strike through June 7, 1974. We remand this action to the district court for reconsideration of the award of damages in the respects set forth above.

Affirmed in part and remanded.

---

11. In addition to lost profits, an injured employer is entitled to recover the extraordinary expenses, not normal to its business operation, incurred as a result of the Union's illegal strike. We note that such extraordinary expenses have been held to include the cost of extra guards hired as a result of picketing, *Flame Coal Co. v. United Mine Workers of America,* 303 F.2d 39, 46 (6th Cir.), *cert. denied,* 371 U.S. 891, 83 S.Ct. 186, 9 L.Ed.2d 125 (1962); overtime pay necessitated to resume normal plant operations at the end of the strike, *Mason-Rust v. Laborer's International Union, Local 42,* 435 F.2d 939, 947 (8th Cir. 1970); *Sheet Metal Workers, Local 223 v. Atlas Sheet Metal Co.,* 384 F.2d 101, 109 (5th Cir. 1967); travel expenses and long distance telephone calls incurred in connection with attempting to end the strike, *Abbot v. Local 142, Journeymen & Apprentices of the Pipefitting Industry,* 429 F.2d 786, 790 (5th Cir. 1970); and extra freight expenses, *Vulcan Materials Co. v. United Steel Workers of America, AFL–CIO,* 316 F.Supp. 509, 515 (N.D.Ala. 1969), *aff'd,* 430 F.2d 446 (5th Cir. 1970)); *International Union of Operating Engineers v. Dahlem Const. Co.,* 193 F.2d 470, 472 (6th Cir. 1951).