**FRITO–LAY, INC., a Delaware Corporation, Plaintiff,**

v.

**INTERNATIONAL BROTHERHOOD OF TEAMSTERS, CHAUFFEURS, WAREHOUSEMEN AND HELPERS OF AMERICA, an unincorporated association, et al., Defendants.**

**No. C–74–1092–CBR.**

United States District Court, N. D. California.

Sept. 15, 1975.

---

------♦------

Littler, Mendelson & Fastiff, San Francisco, Cal., Kilpatrick, Cody, Rogers, McClatchey & Regenstein, Atlanta, Ga., for plaintiff.

Brundage, Neyhart, Beeson & Tayer, San Francisco, Cal., for defendants.

## MEMORANDUM OF OPINION

RENFREW, District Judge.

Plaintiff, Frito-Lay Inc., brought this civil action pursuant to Section 303(b) of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 187(b), against fifteen local unions and two joint councils affiliated with the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America seeking monetary relief for all damages suffered by plaintiff as a consequence of defendants' alleged illegal strike against plaintiffs in violation of Section 8(b)(4)(A) of the LMRA, 29 U.S.C. § 158(b)(4)(A), and Section 303(a) of the LMRA, 29 U.S.C. § 187(a). De-fendants filed a motion to dismiss plaintiff's second amended complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure on the ground that it failed to state a claim upon which relief could be granted.[1] For the purposes of this motion to dismiss, the Court accepts as true the facts alleged in the complaint.

Plaintiff manufactures, sells, and distributes potato chips, corn chips, and other snack food products in Northern California. Defendants are labor organizations who represent route salesmen and warehousemen of plaintiff in Northern California and a small part of Nevada. Defendants also represent route salesmen and warehousemen of Laura Scudder's ("Scudder's"), a snack food division of Pet, Inc., and Granny Goose Foods, Inc. ("Goose"), both of which companies also manufacture, sell and distribute potato chips, corn chips, and other snack food products in California. Between 1960 and December 14, 1973, plaintiff, Scudder's, and Goose were members of an "employer organization" which was created and maintained for the purpose of bargaining for and entering into collective bargaining agreements with defendants. That employer organization negotiated five successive collective bargaining agreements with defendants on behalf of plaintiff, Scudder's, and Goose between March 1, 1960, and February 28, 1974. In a letter dated December 14, 1973, plaintiff notified defendants, Scudder's, and Goose that it was withdrawing from

---

1. Initially plaintiff moved "the Court to rule that, based upon the stipulation of facts entered into by the parties for the purpose of this motion, Defendants have engaged in activity and conduct constituting an unfair labor practice within the meaning of Section 8(b)(4)(A) of the National Labor Relations Act." The stipulation provided that neither party in any way admitted any fact or conceded any contention. Except for the purpose of the Court's disposition of the Motion for Ruling on Preliminary Legal Issue, every action, event and fact set forth in the stipulation was subject to proof. Disposition of the motion would not have resulted in a dismissal of the complaint. At the hearing on this motion the Court informed the parties that any ruling on that motion would constitute an advisory opinion. Plaintiff then agreed to amend its first amended complaint to allege the stipulation of facts entered into by the parties for the purpose of the motion, and the parties agreed to treat the motion before the Court as a motion to dismiss. Subsequently, plaintiff filed a second amended complaint on May 19, 1975, reflecting the agreement of the parties at the hearing. On June 5, 1975, defendants formally filed a motion to dismiss the second amended complaint.

the employer organization and would thereafter bargain on its own behalf with defendants.[2] Similarly, on January 10, 1974, Goose notified plaintiff, Scudder's and defendants of its withdrawal from the employer organization. On January 28, 1974, a negotiating committee representing all of defendants submitted a contract proposal to plaintiff, Scudder's, and Goose which was contained in a single document applicable, without variation, to all three companies. Throughout the negotiations, defendants demanded that the three companies agree either to one contract covering employees of all three companies or to three separate uniform contracts containing identical provisions for each company. At no time did defendants offer proposals which were non-uniform for the three companies.

At various times defendants conditionally agreed to various proposals made by plaintiff, contingent upon the acceptance of such proposals by the other two companies. Defendants also insisted that plaintiff agree to contract provisions that were inapplicable to plaintiff's business operations, but applicable to the business operations of Goose and Scudder's. On four separate occasions between February and May of 1974, separate contract proposals of each company were submitted separately to all members of defendants. Each individual company's proposal was voted on by the employees of all three companies ("group voting"). On none of these occasions were employees allowed to vote alone on the proposal of their own company. Each company repeatedly demanded that its contract proposals be voted on for ratification by its employees only.

On May 12, 1974, defendants commenced a strike against all three companies. One object of that strike was to force or require the three companies to accept one contract covering employees of all three companies or to accept three separate uniform contracts containing identical provisions for each company. On June 3, 1974, the Western Conference of Teamsters ordered defendants to stop using the group voting procedure and allow each company's contract proposal to be voted upon by its own employees. Subsequently, defendants abandoned their insistence upon one contract covering all employees or three separate uniform contracts containing identical provisions. The strike remained in effect against plaintiff until June 29, 1974, when plaintiff's contract proposal was ratified by plaintiff's employees who were allowed to vote separately for ratification.

Section 303(b) of the LMRA provides that whoever shall be injured in his business or property by reason of any violation of Section 303(a) may sue in any district court and shall recover damages sustained and the costs of the suit. 29 U.S.C. § 187(b). Section 303 (a) provides that it shall be unlawful for the purposes of Section 303 only, in any industry or activity affecting commerce, for any labor organization to engage in any activity or conduct defined as an unfair labor practice in Section 8(b)(4). 29 U.S.C. § 187(a). Finally, Section 8(b)(4)(A) provides *inter alia* that it shall be an unfair labor practice for a labor organization or its agents to engage in, or to induce or encourage any individual employed by any person engaged in commerce or in an industry affecting commerce to engage in, a strike where an object thereof is to force or require any employer to join any employer organization.

■ Plaintiff contends that the above-described activity and conduct of defendants constituted an unfair labor practice within the meaning of Section 8(b)(4)(A) of the National Labor Relations Act, and hence violated Section 303(a), thus entitling it to damages pursuant to Section 303(b), 29 U.S.C. § 187(b). More specifically, plaintiff contends that Section 8(b)(4)(A) prohibits unions from forcing competing employ-

---

2. Plaintiff's then current collective bargaining agreement was to expire on February 28, 1974.

ers to bargain on a multi-employer basis and that the conduct of defendants violated that proscription. Defendants argue that violation of Section 8(b)(4)(A) requires that the coercive conduct of the union (in this case a strike) be directed at requiring plaintiff to obtain actual membership in an employer organization. Because the Court agrees with plaintiff's argument, it denies defendants' motion.

The first issue before the Court is whether Section 8(b)(4)(A) prohibits only strikes whose object is to force an employer to join an employer organization or whether it also prohibits a strike whose object has the practical effect of forcing all companies in an industry to acccept one identical contract even though there is no formal employer organization. Neither the wording of the statute nor the NLRB decisions construing it are particularly helpful in applying it to the factual situation present in the instant case. None of the NLRB decisions reach the instant issue as in each of those cases the Board found that an object of the union's conduct was to force the employer to join an existing employer organization. See *Glass Workers Local 1892 (Frank J. Rooney, Inc.)*, 141 N.L.R.B. 106 (1963); *I.L.W.U. Local 8 (General Ore, Inc.,)*, 126 N.L.R.B. 172 (1960); *United Construction Workers (Kanawha Coal Operators Association)*, 94 N.L.R.B. 1731 (1951). The Act does not define the term "employer organization". However, the parties concede that it is an organization which exists for the purpose of engaging in collective bargaining on behalf of its members. Hence, "forcing or requiring any employer * * * to join any * * * employer organization" could be con-

strued quite broadly to cover both the situation where a union tried to force an employer to join an existing employer organization and the situation where the conduct of the union forced a group of employers to act in the same manner as if they were banded together into a formal employer organization (*i. e.*, a *de facto* employer organization). Thus, faced with little guidance from past decisions or the plain wording of the statute, the Court must look at the legislative history behind the statute in order to apply it to the facts in the instant case.

The language found in Section 8(b)(4)(A) was not present in either the House or Senate bills underlying the Labor Management Relations Act of 1947 but rather was inserted into the Act by the House-Senate conference committee. There is no clear indication in the legislative history why the language of the present Secton 8(b)(4)(A) was included in the Act. In their memorandum defendants rely heavily on a portion of the Conference Report which states: "Section 8(b)(4) of the conference agreement has been expanded to cover a matter which was covered by Section 12 of the House bill, namely, concerted activity by a union or its agents to compel an employer or self-employed person to become a member." House Conference Report No. 510, 80th Cong., 1st Sess. 44–45 (1947), U.S.Cong. Serv.1947, pp. 1135, 1150. Yet the Court finds that language to be ambiguous at best.[3] The reference to Section 12 of the house bill is a more enlightening reference than the use of the phrase "concerted activity by a union or its agents to compel an employer or self-employed person to become a member." Section 12(a)(3)(A)[4] of the House bill,

---

3. It seems quite likely that the phrase "to become a member" refers to compelling a self-employed person to join a labor organization, action which is also proscribed by Section 8(b)(4)(A). Regardless, the Court finds that the phrase "to become a member" sheds no light on the meaning of Section 8(b)(4)(A).

4. Section 12(a)(3) of H.R. 3020, 80th Cong., 1st Sess. (1947) provided:

"(a) The following activities, when affecting commerce, shall be unlawful concerted activities:

\* \* \* \* \*

"(3) Calling, authorizing, engaging in, or assisting—

"(A) any sympathy strike, jurisdictional strike, monopolistic strike, or illegal boycott, or any sit-down strike or other concerted interference with an employer's op-

374

when read in conjunction with Sections 2(16) [5] and 9(f)(1) [6] of that bill, prohibited all industry-wide bargaining. Additionally, Section 12(b) [7] of the House bill provided a civil damage remedy to any person injured by such unlawful concerted activity. In that bill, the House had attempted to proscribe industry-wide bargaining which in turn would prevent industry-wide strikes. This intent is reflected both in the language of the bill and the House Report accompanying the bill.[8] The House bill apparently prohibited voluntary as well

erations conducted by remaining on the employer's premises;

"(B) any strike or other concerted interference with an employer's operations, an object of which is to compel an employer to accede to featherbedding practices;

"(C) any strike or other concerted interference with an employer's operations, and object of which is (i) to compel an employer to recognize for collective bargaining a representative not certified under section 9 as the representative of the employees, or (ii) to remedy practices for which an administrative remedy is available under this Act, or (iii) to compel an employer to violate any law or any regulation, order, or direction issued pursuant to any law."

5. Section 2(16) of H.R. 3020, 80th Cong., 1st Sess. (1947) provided:

"The term 'monopolistic strike' means a strike or other concerted interference with an employer's operations which results from any conspiracy, collusion, or concerted plan of acting between employees of competing employers or between representatives of such employees where the employees of such competing employers do not have a common bargaining representative certified under section 9."

6. Section 9(f)(1) of H.R. 3020, 80th Cong., 1st Sess. (1947) provided:

"(f) The Board shall exercise its powers under subsections (b) and (d) subject to the following limitations:

"(1) A representative that has been designated or acts as the representative of employees of any employer shall be ineligible to be certified as the representative of employees of any competing employer, unless the employees of such employers whom the representative seeks to represent are regularly less than one hundred in number and the plants or other facilities of such employers at which the representative acts and seeks to act as such are less than fifty miles apart, but nothing in this paragraph shall prevent any representatives from being affiliated or associated, directly or through a federation, association, or parent organization, with representative of employees of competing employers, if the collective bargaining, concerted activities, or terms of collective bargains or arrangements of such representa-

tives are not subject, directly or indirectly, to common control or approval."

7. Section 12(b) of H.R. 3020, 80th Cong., 1st Sess. (1947) provided:

"Any person injured in his business, person or property by an unlawful concerted activity affecting commerce may sue the person or persons responsible therefor in any district court of the United States having jurisdiction of the parties, without regard to the amount in controversy, and may recover the damages sustained by him as a result of such unlawful concerted activity, together with the costs of the suit, including a reasonable attorney's fee."

8. The House Report stated that the bill "outlaws the closed shop and monopolistic industry-wide bargaining[;] * * * outlaws * * * collusive strikes by employees of competing employers[.] * * * For unlawful concerted activities it gives the person injured thereby a right to sue civilly any person responsible therefor[.] * * * It removes the exemption of labor organizations from the antitrust laws when such organizations, acting either alone or in collusion with employers, engage in unlawful restraints of trade." House Report No. 245, 80th Cong., 1st Sess. 5–6 (1947). That report further provided:

"The bill is the first serious attempt to deal with one of our country's greatest and more pressing problems, industry-wide bargaining and industry-wide strikes that paralyze our economy and that imperil the health and safety of our people.

"The committee has dealt with this problem in two ways:

"First, by amending the National Labor Relations Act, the bill forbids the Board to certify one union as the bargaining agent for employees of two or more competing employers, and also forbids employees of two or more competing employers to conspire together to strike at the same time." Ibid. at 8–9.

That the activity of defendants in the instant case would have been proscribed by the House bill is made clear by a further statement in the House Report which provides:

" 'Monopolistic strike': This is another unlawful activity under section 12. This forbids a strike or other concerted activity interfering with an employer's operations that results from any conspiracy, collusion, or con-

as involuntary multi-employer bargaining.[9] In the minority report on the House bill, there was strong criticism of the total proscription of industry-wide bargaining.[10]

The Senate bill underlying the LMRA allowed voluntary industry-wide or multi-employer bargaining; however, it apparently proscribed involuntary industry-wide bargaining. S. 1126, 80th Cong., 1st Sess. §§ 2(2), 9 (1947). Section 9(b) of that bill provided, *inter alia*, that: "The Board shall decide *in each case* whether, in order to assure to employees the fullest freedom in exercising the rights guaranteed by this Act, the unit appropriate for the purpose of collective bargaining shall be the employer unit, craft unit, plant unit, or subdivision thereof" (emphasis supplied). Additionally, Section 2(2) provided that "for the purposes of section 9(b) hereof, the term 'employer' shall not include a group of employers *except where such employers have voluntarily associated themselves together* for the purposes of collective bargaining" (emphasis supplied). It was after the passage of the House and Senate bills with their conflicting provisions *vis-à-vis* industry-wide bargaining that the language at issue in the instant case was inserted into the LMRA.

In light of this legislative history, the Court concludes that Congress intended to proscribe involuntary indus-

---

certed plan of acting between employees of *competing* employers, unless the employees of the competing employers have a common bargaining agent under section 9(f)(1). Section 9 permits employees of competing employers to have a common bargaining agent only if (1) the bargaining agent represents less than 100 employees of each employer and (2) the plants of the competing employers are less than 50 miles apart.

"What this language, and that of section 9 (f)(1), is intended to do is to put a stop to strikes that paralyze the economy of our country and imperil the health and safety of our people. We have laws to forbid competing employers to conspire together to close their plants, fix their prices, and otherwise to restain trade. There is no justification for permitting employees of competing employers to enter into conspiracies that have the same effect. The language of the bill does not forbid employees of competing employers to strike at the same time. It forbids their doing so collusively." *Ibid.* at 24.

9. House Report No. 245 stated in pertinent part:

"Probably the most important clause of section 9(f) is that which limits industry-wide bargaining and which, with sections 2(16) and 12(3)(A), dealing with monopolistic strikes, is designed to put an end to strikes, such as we have experienced particularly in the coal and steel industries, in which powerful and Nation-wide unions have brought the compelling pressure of strikes to bear more upon the Government and the public than upon the employers involved. *Arrangments by which competing employers combine, voluntarily or involuntarily, to bargain together, and arrangements by which great national and international labor monopolies dictate*

the terms *upon which competing employers must operate seriously undermine our free competitive system.* They undermine, also, the rights of the men in the mines and in the shops, who find their terms of employment determined not according to their circumstances and those of their employers but by arbitrary decisions of the national and international officers." *Ibid.* at 35 (emphasis supplied).

10. The minority report stated in pertinent part:

"Section 9(f) precludes the Board from certifying a single union as the representative of employees of competing employers, subject to extremely minor exceptions. This is further designed to implement the provisions against industry-wide bargaining upon which we have already commented. The language of this section which makes such representation legal 'if the collective bargaining, concerted activites, or terms of collective bargains or arrangements of such representatives are not subject, directly or indirectly, to common control or approval,' makes it clear that the sponsors of this bill desire bargaining only on an individual employer basis. Under the realities of modern industrial life, any such proposal is pure fantasy. It disregards the fact that employers compete with one another, both as to the price and quality of their product, and for labor. It is unthinkable, for example, that the large automobile manufacers, all of whom compete for labor in the Detroit market, can pay appreciably different wages. Yet, this provision would necessarily mean that the wage levels of entire industries would be forced down to the lowest level which any substantial group of employees were inclined to, or could, accept." *Ibid.* at 86.

try-wide bargaining when it enacted Section 8(b)(4)(A). Accordingly, the Court holds that Section 8(b)(4)(A) proscribes not only strikes where an object thereof is to force an employer to join a formal employer organization, but also strikes where an object thereof is to force several employers to act in effect as if they belonged to such an employer organization which engaged in industry-wide bargaining on their behalf. To hold otherwise would be to exalt form over substance and disregard the totality of the forces which gave rise to Section 8(b)(4)(A). If defendants conduct their collective bargaining in a manner which forces employers in an industry to act as if they were members of a formal employer organization, then there is no reason not to subject them to civil liability under Section 303 (b) of the LMRA.

■ Thus, the remaining issue before the Court is to determine whether plaintiff has alleged facts which if true would subject defendants to civil liability under Section 303(b) in light of the Court's construction of Section 8(b)(4) (A). More specifically, the Court must decide whether the allegations in the complaint establish that an object of the strike in question was to force plaintiff, Scudder's, and Goose to bargain and act as if they belonged to a formal employer organization. Although the Court is not certain of the precise economic impact of the alleged conduct of defendants on the collective bargaining process in the instant case and is not certain whether the nonexistence of any of the conduct in question would vitiate the Court's conclusion, the Court concludes that the facts alleged establish that an object of defendants' strike was to force plaintiff to bargain and act as if it belonged to a formal employer organization.

The key factors which lead the Court to conclude that plaintiff has stated a claim under Section 303(b) can be divided into two categories: those factors which establish the economic effect of the conduct of defendants and those factors which bear on the issue of intent.[11] With respect to the economic effect of defendants' conduct, a course of conduct wherein defendants would conditionally accept plaintiff's contract proposals contingent upon acceptance of the exact same proposal by Scudder's and Goose, wherein all contract proposals by plaintiff could only be ratified by a group vote of the employees of all three companies and not just the employees of plaintiff, wherein defendants repeatedly demanded that the three companies agree to one contract covering employees of all three companies or to three separate uniform contracts containing identical provisions for each company, and wherein defendants demanded that plaintiff agree to contract provisions which were inapplicable to plaintiff's business operations but applicable to the business operations of Goose or Scudder's, is exactly equivalent to forcing the three companies to form an employer organization to conduct collective bargaining. Which of these factors are necessary or sufficient elements of a claim under Section 303(b), the Court need not decide as it concludes that collectively they establish the requisite economic impact. The Court does note that the first factor mentioned, that of conditioning any acceptance upon execution of identical contracts with the other two companies, renders it impossible to have anything other than one uniform contract for the three companies, regardless of the bargaining power of the parties. With respect to the question of intent, defendants' demand for either one contract covering the employees of all three companies or three separate uniform contracts containing identical provisions for

---

11. The Court is not certain to what extent an action under Section 303(b) requires proof of intent on the part of defendants. Nevertheless, as is set forth below, it believes that the allegations of the complaint are sufficient to meet any attack on this ground in a motion to dismiss.

each company, defendants' adoption of this demand as a stated object of its strike, defendants' insistence that plaintiff agree to contract provisions inapplicable to plaintiff's business operations but applicable to the operations of Goose and Scudder's, and defendants' insistence upon group voting by all the employees of the three companies as the means by which plaintiff's contract proposals would be ratified, give rise to a strong inference that defendants intended to force the plaintiff to bargain as if it were a member of an actual employer organization. Moreover, it is quite possible that there is no intent element under Section 303(b) and that the law will impute to defendants, as an object of their conduct, the natural and probable consequences of their acts. Accordingly, the Court holds that plaintiff has stated a claim under Section 303(b).

It is hereby ordered that defendants' motion to dismiss is denied.