664 F.2d 481
 109 L.R.R.M. (BNA) 2647, 92 Lab.Cas. P 13,184
 MOBILE MECHANICAL CONTRACTORS ASSOCIATION, INC., Plaintiff-Appellee,
v.
Edward J. CARLOUGH, Individually, and as the representative
of all members of the Sheet Metal Workers'
International Association, et al.,
Defendants-Appellants.
 No. 79-2054.
 United States Court of Appeals,
Fifth Circuit.
 
 Unit B*
 Dec. 21, 1981.
 Donald W. Fisher, Toledo, Ohio, Roderick P. Stout, Mobile, Ala., for defendants-appellants.
 Willis C. Darby, Jr., James Forrest Hinton, Jr., Mobile, Ala., for plaintiff-appellee.
 Appeal from the United States District Court for the Southern District of Alabama.
 Before GODBOLD, Chief Judge, TUTTLE and HILL, Circuit Judges.
 GODBOLD, Chief Judge:
 
 
 1
 This case concerns a lengthy dispute between the Mobile Mechanical Contractors, ("the association") an association representing several employers for collective bargaining purposes, and Sheet Metal Workers' International Association ("the union"), its president Edward J. Carlough, and its Mobile local ("the union local"). The dispute arose over two union demands that triggered a peaceful economic strike by the local from July 16 to October 16, 1974.
 
 
 2
 The union local had demanded that the association contribute to SASMI, a nationwide employee trust fund for sheet metal workers founded by the union and Carlough. The association has consistently maintained that the trust fund, as it was then structured, violated § 302 of the Labor Management Relations Act of 1947, 29 U.S.C. § 186.[1] The union local also demanded that the association agree to the union's "Standard Form of Union Agreement." Article X, § 8 of this agreement provided that if the association and the union local reach a bargaining impasse they must submit their dispute to the National Joint Adjustment Board, composed of union representatives and representatives of the Sheet Metal and Air Conditioning Contractors' National Association, an employer organization to which the Mobile Contractors' Association members do not belong. The adjustment board is empowered to formulate new contract terms through unanimous decision. Otherwise the dispute would be returned to the association and the local for resolution through traditional economic warfare.[2]
 
 
 3
 The association turned to both the National Labor Relations Board and the courts for relief from the strike. On August 23, 1974 the association filed unfair labor practice charges against the union local, and two months later filed similar charges against the union and Carlough. The Board consolidated these charges and set a hearing. The parties settled, however, and on December 3, 1976 the NLRB entered a consent order restraining the union local from making similar future demands for the trust fund or the arbitration clause. The Board's order was enforced by this court, NLRB v. Sheet Metal Workers International Assn. Local No. 441, No. 77-3080 (5th Cir. Nov. 2, 1974) (unpublished).
 
 
 4
 The association also sued the defendants in federal district court seeking to enjoin the strike under § 302(e) of the Labor Management Relations Act, 29 U.S.C. § 186(e). The district court held that the trust fund violated § 302(c) of the Act, 29 U.S.C. § 186(c), and granted a preliminary injunction restraining the union local from continuing the strike or demanding that the association contribute to the trust fund. Mobile Mechanical Contractors Assn. v. Carlough, 382 F.Supp. 1134 (S.D.Ala.1974). On appeal this court concluded that the injunction issue was moot because, inter alia, during the pendency of the appeal the parties had agreed to a contract without the trust fund. Mobile Mechanical Contractors Association v. Carlough, 566 F.2d 1213 (5th Cir. 1977). The parties also omitted from the contract Article X, § 8, of the Standard Form of Union Agreement.
 
 
 5
 After this court remanded the case to the district court, the association sought damages for the strike from the union and Carlough on a variety of theories. It alleged an implied cause of action in favor of employers under § 302(c) based upon the union local's demand for the trust fund, a diversity claim under Alabama law for tortious interference with a lawful business, and a claim under § 303, 29 U.S.C. § 187, grounded on the theory that the strike for Article X was an unfair labor practice under § 8(b)(4)(A) of the National Labor Relations Act, 29 U.S.C. § 158(b)(4)(A). In addition, the association sought punitive damages on the first two claims.
 
 
 6
 The district court denied defendants' motion for summary judgment and granted summary judgment as to liability in favor of the association on all of these claims, Mobile Mechanical Contractors Assn. v. Carlough, 456 F.Supp. 310 (S.D.Ala.1978). A trial was held to determine damages. The jury awarded $17,000 in general damages against the union and Carlough and $10,000 in punitive damages against Carlough. The defendants do not question the amount of damages awarded but contend that the district court erred in failing to grant their motion for summary judgment as to liability on all of the claims.
 
 I. Section 303 claim
 
 7
 Section 303(b) of the Labor Management Relations Act, 29 U.S.C. § 187(b), provides a cause of action for damages in favor of any person sustaining injury to his property or business from any union unfair labor practice set forth in § 8(b)(4) of the National Labor Relations Act, 29 U.S.C. § 158(b)(4).[3] The association's § 303 claim is premised on the argument that the strike to obtain Article X violated § 8(b)(4)(A), which proscribes strikes to force an employer to join an employer organization.[4]
 
 
 8
 Relying on Frito-Lay, Inc. v. Teamsters, 401 F.Supp. 370 (N.D.Cal.1975), affirmed, 623 F.2d 1354 (9th Cir. 1980), the district court held that § 8(b)(4) (A) prohibits not only efforts to force an employer to join an employer organization but also efforts to force an employer to act as if it belonged to an employer organization. It then reasoned that, by forcing the association to submit contract disputes to the adjustment board, Article X, § 8, forced the association to cede some of its collective bargaining authority to the national employers organization to which neither the association nor its members belong. The district court then concluded that this requirement was tantamount to forcing the association to act as if it belonged to the national employers association.
 
 
 9
 The defendants first argue that the decisions of the district court and the Ninth Circuit in Frito-Lay are based upon an erroneous interpretation of the legislative history of § 8(b)(4)(A). To say the least, the legislative history of § 8(b)(4)(A) is cryptic. The Conference Committee Report states only that
 
 
 10
 Section 8(b)(4) of the conference agreement has been expanded to cover a matter which was covered by section 12 of the House bill, namely, concerted activity by a union or its agents to compel an employer or self-employed person to become a member.
 
 
 11
 House Conference Report No. 510, 80th Cong., 1st Sess. 44-45; (1947) U.S.Code Cong. & Ad.News, pp. 1135, 1150. Moreover, the conference agreement also explicitly omitted the provisions of the House bill "treating 'monopolistic strikes' as unlawful concerted activities" and "the matter of industry-wide bargaining." Id. at 1165.
 
 
 12
 Defendants contend that the Frito-Lay district court (and presumably the Ninth Circuit since it affirmed) overlooked these passages from the conference report and that these passages, as the last words of Congress on the subject, are controlling. We disagree. The opinions in Frito-Lay reflect a probing and comprehensive analysis of a legislative history that is far more complex than the defendants suggest.
 
 
 13
 Section 8(b)(4)(A) was the product of a compromise solution between two warring factions in Congress, those that opposed industry-wide bargaining and those that favored it. Compare H.R.Rep.No.245, 80th Cong., 1st Sess. 5-6, 24, 35 (1947) with id. at 86 and with S. 1126, 80th Cong., 1st Sess. §§ 2(2), 9 (1947). The conference committee undertook to reconcile a House bill that banned all multi-employer bargaining, H.R. 3020, 80th Cong., 1st Sess. §§ 2(16), 9(f)(1), 12(a)(3) (1947) and a Senate bill that banned only involuntary multi-employer bargaining, S. 1126, 80th Cong., 1st Sess. §§ 2(2), 9 (1947). Contrary to defendants' assertion, the opinions in Frito-Lay did not overlook the conference report but interpreted it as rejecting the total ban on multi-employer bargaining contained in the House bill in favor of the more limited ban on involuntary multi-employer bargaining contained in the Senate bill. See 623 F.2d at 1358-59; 401 F.Supp. at 373-76. Moreover, this interpretation is supported by decisions of courts and the NLRB that uniformly have construed § 8(b)(4)(A) to proscribe the involuntary multi-employer bargaining that results when a union attempts to compel an employer to join an employer organization for collective bargaining purposes. See Amax Coal Co. v. NLRB, 614 F.2d 872, 878-81 (3d Cir. 1980), rev'd on other grounds, --- U.S. ----, 101 S.Ct. 2789, 69 L.Ed.2d 672 (1981); Union de Tronquistas de Puerto Rico v. Arlook, 586 F.2d 872, 876 (1st Cir. 1978); United Mine Workers, Local 1854 (Amax Coal Co.), 238 NLRB 1583 (1978), enforcement denied on other grounds, 614 F.2d 872 (3d Cir. 1980), rev'd on other grounds, --- U.S. ----, 101 S.Ct. 2789, 69 L.Ed.2d 672 (1981); Glass Workers Local 1892 (Frank J. Rooney, Inc.), 141 NLRB 106 (1963); I.L.W.U. Local 8 (General Ore, Inc.), 126 NLRB 172 (1960); United Construction Workers (Kanawha Coal Operators Assn.), 94 NLRB 1731 (1951).
 
 
 14
 Frito-Lay holds that § 8(b)(4)(A) prohibits union efforts to compel an employer to join an employer organization. We conclude that this section also prohibits union efforts to compel an employer to act as if it were a member of an employer organization. A contrary conclusion would mean that Congress intended to allow unions to accomplish indirectly the forbidden objectives by merely insisting that the employer though not a member of the organization conduct itself as though it were and accordingly abide by collective bargaining decisions made by the organization. The reasoning of the Ninth Circuit in Frito-Lay is persuasive on this point:
 
 
 15
 There is nothing talismanic about the term "employer organization." Neither the Board nor the courts have ever required that employers organize themselves into a formal association to be considered an employer organization for purposes of the Act. On the contrary, "substance rather than legalistic form is all the Board has ever required in multi-employer bargaining." ... To form a multi-employer group, individual employers need only exhibit an unequivocal intention to be bound in collective bargaining by group rather than individual action.... No formal organizational structure is required. Recognizing the potential informality of multi-employer bargaining units, we think it unlikely that Congress sought in section 8(b)(4)(A) to prohibit a union from forcing an employer organization but to permit a union to force competing employers to bargain together as an informal group. Attributing that interpretation to the section would allow a union to force employers to engage in multi-employer bargaining as long as the Union did not make the mistake of requiring the employers involved to become members of a formal, existing employer organization.
 
 
 16
 623 F.2d at 1358 (citations omitted).
 
 
 17
 We turn to the next question, which is whether Article X compels the association or its members to act as if they were members of the national employers association. Defendants, conceding that the strike to obtain Article X may have violated §§ 8(b)(1)(B) and 8(b)(3),[5] argue that Article X does not force the association to bargain through the national employers association as though members thereof, rather it only requires the association to submit to "a limited form of interest arbitration before a private tribunal, (the adjustment board) ... on which half of the members were appointed by the (union) and half by an employer organization, SMACNA (the national employers association), to which MMCA (the association) did not belong." Defendants note further that Article X leaves the association free to bargain with union locals and that the adjustment board takes over only when the association's bargaining reaches impasse. Even then, the adjustment board cannot forge the association's contract unless it does so unanimously.
 
 
 18
 These distinctions are unpersuasive. The adjustment board was formed to resolve collective bargaining disputes between members of the national employers association and union locals. Although the association is not a member of the national employers association, Article X compels it to act as if it were a member and submit collective bargaining disputes it has with union locals to the adjustment board. The critical factor is that the board performs collective bargaining services for the association as if it were a member of the national employers association.[6] To the extent union locals make proposals to the association that parallel those gained from members of the national employers association, the association, upon reaching impasse, may not decide independently to endure a strike; rather, it-like a member of the national employers association-must abide by the decision of the adjustment board. And members of the national employers association on the adjustment board are likely to see little reason to free the Mobile association from provisions already contained in national contracts. The net effect is that Article X compels the association to act as if it were a member of the national employers association for collective bargaining purposes. The strike to obtain Article X thus violated § 8(b)(4)(A), and the district court properly determined that the association was entitled to recover damages under § 303. See Frito-Lay, 623 F.2d 1354, supra.
 
 II. Preemption
 
 19
 At oral argument defendants' counsel conceded that the district court's award of general damages for the strike would be supported by a finding in the association's favor on either the cause of action based on § 8(b)(4)(A) or the implied cause of action under § 302(b). Since we have resolved the § 8(b)(4) (A) issue in the association's favor, we need not decide whether the district court correctly found an implied cause of action under § 302(b). However, the award of punitive damages is supportable only under the association's state law claim for damages from the strike.[7]
 
 
 20
 We must decide whether that claim was preempted. The district court held that the association had a cause of action under Alabama law for tortious interference with lawful business and that this claim was not preempted under the doctrine of San Diego Building Trades Council v. Garmon, 359 U.S. 236, 79 S.Ct. 773, 3 L.Ed.2d 775 (1959). It found that the "underlying wrong" upon which the association's state claims were based was that provisions in the trust fund violated § 302 and that violation of a federal law resulting in interference with a lawful business was wrongful interference with business under Alabama law. The district court noted that the NLRB had stated in a recent decision that it had no jurisdiction to determine whether SASMI, the trust fund, violated § 302, Sheet Metal Workers International Association (Central Florida Sheet Metal Contractors Assn.), 234 NLRB 1238 (1978),[8] and, based thereon, reasoned that state law claims founded upon breach of legal duties imposed by § 302 do not encroach upon the primary jurisdiction of the NLRB. Relying primarily upon Sears, Roebuck & Co. v. Carpenters, 436 U.S. 180, 98 S.Ct. 1745, 56 L.Ed.2d 209 (1978) and United Auto Workers v. Russell, 356 U.S. 634, 78 S.Ct. 932, 2 L.Ed.2d 1030 (1958), the district judge concluded that the union's peaceful strike to obtain the trust fund fell within an exception to the Garmon doctrine.
 
 
 21
 We construe the preemption doctrine differently. The fundamental precept of Garmon is that liability under a state cause of action is preempted whenever it poses a serious risk of conflict with national labor policy. 359 U.S. at 243, 79 S.Ct. at 778. In determining whether such a risk exists we apply the rule that state causes of action are preempted if they attach liability to conduct that is arguably protected under § 7 or arguably prohibited under § 8 of the National Labor Relations Act. 359 U.S. at 245, 79 S.Ct. at 779.
 
 
 22
 Application of the rule to this case leads us to conclude that the union's peaceful strike to obtain the trust fund fell within the preemptive umbrella of Garmon. The district court characterized the underlying wrong upon which the association's state claims were based as the union's demand for the trust fund, a trust fund that violated § 302. The basis of the association's state claims-and the activity from which its alleged damages flow-is not the union's demand for the trust fund but the strike in support of that demand. The proper focus of our preemption analysis is thus whether the strike to obtain the trust fund is arguably protected or prohibited by the Act.
 
 
 23
 Board decisions establish that a strike to obtain the trust fund is quite literally either protected or prohibited activity under the Garmon standard. Although not mentioned in the district court opinion, the association had previously petitioned the Board, alleging that the strike to obtain the trust fund was an unfair labor practice under § 8. The Board issued a cease and desist order prohibiting, inter alia, the union from striking to obtain the trust fund, and this court enforced the order.[9] Thus, the Board already has exercised its jurisdiction in this case and prohibited the very activity-the strike for the trust fund-for which the association now seeks damages under state law. To permit the association to supplement the Board's remedy with additional state damage remedies runs counter to the teaching of Garmon:
 
 
 24
 Our concern is with delimiting areas of conduct which must be free from state regulation if national policy is to be left unhampered. Such regulation can be as effectively exerted through an award of damages as through some form of preventative relief. The obligation to pay compensation can be, indeed is designed to be, a potent method of governing conduct and controlling policy. Even the states' salutary effort to redress private wrongs or grant compensation for past harm cannot be exerted to regulate activities that are potentially subject to the exclusive federal regulatory scheme.... The sanction (an award of damages) involves a conflict with federal policy in that it involves allowing two lawmaking sources to govern. In fact, since remedies form an ingredient of any integrated scheme of regulation, to allow the state to grant a remedy here which has been withheld from the National Labor Relations Board only accentuates the danger of conflict.
 
 
 25
 We think it clear that the Board's order preventing the defendants from striking to obtain the trust fund preempted the association's state claims for damages based upon the state conduct. 359 U.S. at 246-47, 79 S.Ct. at 780-781.
 
 
 26
 We find nothing in the Board's Central Florida decision lending support to the district court's conclusion that these state claims were not preempted. In Central Florida, 234 NLRB 1238 (1978), the Board rejected the contention of an employer association that the union's insistence on the trust fund was a nonmandatory subject of bargaining. The Board's decision rested largely on its conclusion that it lacked jurisdiction to determine the legality of the trust fund under § 302. This conclusion does not mean, however, that the Board lacks jurisdiction to determine whether a union may strike to obtain the trust fund. Indeed, the Board in Central Florida concluded that the trust fund was a mandatory subject of bargaining. See id. Strikes over mandatory subjects of bargaining are, of course, protected activity under § 7, NLRB v. Erie Resistor Corp., 373 U.S. 221, 233-34, 83 S.Ct. 1139, 1148-49, 10 L.Ed.2d 308 (1963), and are entitled to preemptive protection. Garmon, supra.[10]
 
 
 27
 The conflict between the consent order issued by the Board in this case prohibiting the union from striking to obtain the trust fund and the Board's decision in Central Florida allowing the union to strike for the same trust fund is more apparent than real. The Board entered no findings of fact in its consent order that would collaterally estop another union local from defending a strike by asserting the validity of the trust fund under § 8 or that would prevent the Board from later exploring the legality of the trust fund. The Board expressly declined to rule on the issues it subsequently decided in Central Florida.[11] In either case, however, the strike for the trust fund was protected or prohibited.
 
 
 28
 The district court relied on Sears and other cases where state law was not found to be preempted. In Sears the Supreme Court held that a state trespass claim against picketing was not preempted under Garmon. But it was critical to the Court's analysis that the state law claim was based upon the location of the picketing and not upon "whether the picketing had an objective proscribed by federal law...." 436 U.S. at 198, 98 S.Ct. at 1758.
 
 
 29
 Similarly in United Auto Workers v. Russell, supra, the Supreme Court held that the state tort of wrongful interference with a lawful business relationship was not preempted where the picketing involved physical obstruction of a plant entrance and threats of violence. The Court carefully noted that only damages resulting from these activities could be awarded, as opposed to damages resulting from the strike and picketing themselves.[12] 356 U.S. at 645, 78 S.Ct. at 939. In contrast, if defendants' claim of tortious interference was not preempted in the instant case, damages caused solely by the fact of the strike would be awarded.
 
 
 30
 One other case merits discussion. In Farmer v. Carpenters, 430 U.S. 290, 97 S.Ct. 1056, 51 L.Ed.2d 338 (1977), although the Supreme Court found no preemption of a state claim for intentional infliction of emotional distress in connection with discriminatory hiring hall practices, the Court vacated the judgment of the state court of appeal and remanded because evidence introduced at trial might have led the jury to award damages to plaintiff for employment discrimination. Recovery, said the Court, had to be based upon "outrageous" conduct above and beyond the mere existence of discrimination. Likewise, recovery of damages based upon the existence of a strike without more would unduly interfere with federal labor regulations.
 
 
 31
 In summary, we affirm the district court's judgment that the union committed an unfair labor practice under § 8(b)(4)(A) by striking to obtain the arbitration clause (Article X) because it forced the association to act as a member of another employer organization. We also affirm the jury award of actual damages suffered by the association as a result of this unfair labor practice. We reverse the district court's holding that the state law claim for damages was not preempted and reverse the jury award of punitive damages.
 
 
 32
 AFFIRMED in part and REVERSED in part.
 
 
 
 *
 Former Fifth Circuit case, Section 9(1) of Public Law 96-452-October 14, 1980
 
 
 [1]
 Specifically, the association argued that the trust fund contravened § 302(c)(5)(B), 29 U.S.C. § 186(c)(5)(B), which requires that employers and the union be equally represented in the administration of employee benefit trust funds
 
 
 [2]
 Article X, § 8 of the Standard Form of Union Agreement provides:
 (a) Should the negotiations for renewal of this agreement become deadlocked in the opinion of the Local Union or of the Local Contractors' Association, or both, notice to that effect should be given to the office of the General President of Sheet Metal Workers' International Association and the national office of the Sheet Metal & Air Conditioning Contractors' National Association, Inc. If the General President of Sheet Metal Workers' International Association and the Chairman of the Labor Committee of Sheet Metal and Air Conditioning Contractors' National Association believe the dispute might be adjusted without going to final hearing before the National Joint Adjustment Board, each will then designate a panel representative who shall proceed to the locale where the dispute exists as soon as convenient, attempt to conciliate the differences between the parties and bring about a mutually acceptable agreement. If such panel representatives or either of them conclude that they can not resolve the dispute, the parties thereto and the General President of Sheet Metal Workers' International Association and the national office of Sheet Metal and Air Conditioning Contractors' National Association shall be promptly so notified without recommendation from the panel representatives. Should the President of Sheet Metal Workers' International Association or the Chairman of the Labor Committee of Sheet Metal and Air Conditioning Contractors' National Association fail or decline to appoint a panel member or should notice of failure of the panel representatives to resolve the dispute be given, the parties shall promptly be notified so that either party may submit the dispute to the National Joint Adjustment Board.
 The dispute shall be submitted to the National Joint Adjustment Board pursuant to the rules as established and modified from time to time by the National Joint Adjustment Board. The unanimous decision of said Board shall be final and binding upon the parties, reduced to writing, signed and mailed to the parties as soon as possible after the decision has been reached. There shall be no cessation of work by strike or lockout unless and until said Board fails to reach a unanimous decision and the parties have received written notification of its failure.
 (b) Any application to the National Joint Adjustment Board shall be upon forms prepared for that purpose subject to any changes which may be decided by the Board from time to time. The representatives of the parties who appear at the hearing will be given the opportunity to present oral argument and to answer any questions raised by members of the Board. Any briefs filed by either party including copies of pertinent exhibits will also be exchanged between the parties in advance of the hearing.
 (c) The National Joint Adjustment Board shall have the right to establish time limits which must be met with respect to each and every step or procedure contained in this section. In addition, the President of SMWIA and the Chairman of the National Labor Committee of SMACNA shall have the right to designate time limits which will be applicable to any particular case and any step therein which may be communicated to the parties by mail, telegram, or telephone notification.
 (d) Unless a different date is agreed upon mutually between the parties or is directed by the unanimous decision of the National Joint Adjustment Board, all effective dates in the new agreement shall be retroactive to the date immediately following the expiration date of the expiring agreement.
 
 
 [3]
 29 U.S.C. § 187 provides in pertinent part:
 (a) It shall be unlawful, for the purpose of this section only, in an industry or activity affecting commerce, for any labor organization to engage in any activity or conduct defined as an unfair labor practice in Section 158(b)(4) of this title.
 (b) Whoever shall be injured in his business or property by reason of any violation of Subsection (a) of this section may sue therefor in any district court of the United States ... and shall recover the damages by him sustained and the cost of the suit.
 Defendants do not question, and therefore we do not decide, whether the contractors association as an employer organization was injured in its "business or property" within the meaning of § 303. Cf. United Mine Workers of America v. Railing, 401 U.S. 486, 91 S.Ct. 991, 28 L.Ed.2d 272 (1971); Farmers Co-Op Oil Co. v. Socony-Vacuum Oil Co., 133 F.2d 101 (8th Cir. 1942).
 
 
 [4]
 29 U.S.C. § 158(b)(4)(A) provides:
 (b) It shall be an unfair labor practice for a labor organization or its agents-...
 (4)(i) to engage in, or induce or encourage any individual employed by any person engaged in commerce to engage in, a strike ... or (ii) to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where in either case an object thereof is-
 (A) Forcing or requiring any employer or self-employed person to join any labor or employer organization....
 
 
 [5]
 Relying on the Supreme Court's recent decision in NLRB v. Amax Coal Co., --- U.S. ----, 101 S.Ct. 2789, 69 L.Ed.2d 672 (1981), defendants take this concession a step further and contend that, because Article X violates § 8(b) (1)(B), it necessarily must not violate § 8(b)(4)(A) since the two provisions must regulate different activity. The argument is flawed. While § 8(b)(1)(B) was intended, among other things, "to prevent unions from forcing employers to join multiemployer bargaining units," --- U.S. at ----, 101 S.Ct. at 2797, 69 L.Ed.2d at 683, it does not follow that § 8(b)(1)(B) was the exclusive means used by Congress to curb such activity nor that the activities proscribed by §§ 8(b)(1)(B) and 8(b)(4)(A) were not intended to overlap in certain circumstances. Indeed, if a union were to compel an employer to join an employer organization that engaged in collective bargaining for the employer, the union would violate both provisions simultaneously. The Board explicitly so held in its decision in the Amax case, United Mine Workers, Local 1854 (Amax Coal Co.), 238 NLRB 1583 (1978), and the issue was not appealed. 69 L.Ed.2d at 679 n.6. Thus, although not all § 8(b)(4)(A) violations are also § 8(b)(1)(B) violations and vice versa, the defendants' argument that a violation of one can never be a violation of the other defies both the literal language and authoritative interpretation of the provisions. Accepting the union's concession that Article X may violate § 8(b)(1)(B), we hold only that this concession does not preclude a finding that the defendants also violated § 8(b) (4)(A)
 
 
 [6]
 Article X only requires resort to the adjustment board when the Mobile association and union locals reach impasse, but this does not alter our conclusion. The arbitration by the adjustment board is a form of collective bargaining. See NLRB v. Sheet Metal Workers, Local 38, 575 F.2d 394, 400 (2d Cir. 1978). Thus, Article X forces the Mobile association to act as if it were a member of the national employers association for collective bargaining purposes in that the Mobile association, like a member of the national association, must submit disputes at impasse to the national association's interest arbitration board
 
 
 [7]
 The association did not seek punitive damages on its § 8(b)(4)(A) claim. Although it did seek punitive damages in its claim alleging an implied cause of action under § 302(b), that claim cannot support such an award. Assuming without deciding that the district court was correct in finding an implied cause of action, but see Piper v. Chris-Craft Industries Inc., 430 U.S. 1, 97 S.Ct. 926, 51 L.Ed.2d 124 (1977), punitive damages would not be recoverable under it. See Flaks v. Koegel, 504 F.2d 702 (2d Cir. 1974); Green v. Wolf Corp., 406 F.2d 291 (2d Cir. 1968), cert. denied, 395 U.S. 977, 89 S.Ct. 2131, 23 L.Ed.2d 766 (1969)
 
 
 [8]
 The Board's decision in Central Florida, including the question of whether the Board has jurisdiction to determine if the trust fund violates § 302, has also been decided. Central Florida Sheetmetal Contractors Assn. v. NLRB, 664 F.2d 489 (5th Cir. 1981). As our analysis indicates infra, whether the Board has jurisdiction to determine the legality of the trust fund does not affect our resolution of the preemption issue in this case
 
 
 [9]
 Record at 447-61
 
 
 [10]
 Our holding today in Central Florida, which affirms the Board's decision but which refines its rationale, does not compel a different conclusion. We find in Central Florida that the Board's construction of § 8(b)(3) of the National Labor Relations Act, which permits bargaining in good faith to include bargaining to impasse for a trust fund that facially comports with § 302 of the Labor Management Relations Act, is reasonable and consonant with overall federal labor policy. Thus, the Board properly exercised its own jurisdiction to determine that the strike was protected by § 7
 
 
 [11]
 Record at 448-49
 
 
 [12]
 Although Russell did not expressly rely upon the presence of violence to support its holding of no preemption, subsequent Supreme Court cases have so characterized it. See, e. g., Motor Coach Employees v. Lockridge, 403 U.S. 274, 297 n.7, 91 S.Ct. 1909, 1923, 29 L.Ed.2d 473 (1971)