**AMERICAN COMMERCIAL BARGE LINES COMPANY, Inland Tugs Company, et al., Plaintiffs-Appellees,**

v.

**SEAFARERS INTERNATIONAL UNION OF NORTH AMERICA, ATLANTIC, GULF, LAKES AND INLAND WATERS DISTRICT, AFL–CIO, et al., Defendants-Appellants.**

No. 83–3088.

United States Court of Appeals, Fifth Circuit.

April 23, 1984.

Rehearing Denied June 1, 1984.

James M. Altman, New York City, Louis L. Robein, Jr., New Orleans, La., for defendants-appellants.

Andrew C. Partee, New Orleans, La., for plaintiffs-appellees.

Before BROWN, WISDOM and JOHNSON, Circuit Judges.

JOHN R. BROWN, Circuit Judge:

This is a suit by a group of employers seeking to enjoin collective bargaining demands of several unions and their strikes aimed at causing the employers to contribute to union pension and welfare trust funds. The employers contend that the trusts violate § 302(c) of the Labor-Management Relations Act (LMRA) both on their face and as administered. The employers also seek damages for the strike. We hold that § 302(e), which regulates the structure and administration of employee trust funds, does not create a private action for damages in favor of employers. We further hold that the National Labor Relations Board (NLRB), which has taken jurisdiction over two unfair labor practice cases brought by the unions against the employers for ceasing contributions to the funds and creating their own funds, should decide in the first instance whether the strikes are permissible at this point.

### Facts

Plaintiffs-appellees (Employers), are five companies engaged in the business of transportation by barges and towboats along this country's inland waterways—American Commercial Barge Line Company (ACBL), Inland Tugs Company (ITC), Mac Towing, Inc. (MAC), Louisiana Dock Company, Inc. (LDC), and American Commercial Terminals, Inc. (ACT). The defend-

ants-appellants (Unions) are two labor organizations, the Seafarers International Union of North America, Atlantic, Gulf, Lakes and Inland Waters District, AFL–CIO (SIU) and the United States Industrial Workers, Service, Transportation, Professional and Government of North America (UIW).

For more than twenty years the SIU has been the exclusive collective bargaining representative of unlicensed employees aboard towboats and barges operated by ITC and its predecessor barging companies. Similarly, the UIW has been the long-time exclusive collective bargaining representative of production and maintenance employees of LDC at its Harahan, Louisiana and Cairo, Illinois facilities and of the same unit of ACT employees at its Louisville, Kentucky facility. Because the UIW is chartered by and affiliated with the SIU and because ITC, LDC and ACT all are affiliated companies owned by the same parent corporation, the two collective bargaining relationships between the Employers and the Unions are integrally related.

For approximately two decades, as part of successive SIU–ITC collective bargaining agreements, ITC has been required to contribute and in fact has contributed to five labor-management trust funds created pursuant to § 302(c)(5)–(6) of the Labor-Management Relations Act (Act):[1] The

---

1. Section 302 of the Act provides in relevant part:

(a) It shall be unlawful for any employer or association of employers or any person who acts as a labor relations expert, adviser, or consultant to an employer or who acts in the interest of an employer to pay, lend, or deliver, or agree to pay, lend, or deliver, any money or other thing of value—

(1) to any representative of any of his employees who are employed in an industry affecting commerce; or

(2) to any labor organization, or any officer or employee thereof, which represents, seeks to represent, or would admit to membership, any of the employees of such employer who are employed in an industry affecting commerce; or

(3) to any employee or group or committee of employees of such employer employed in an industry affecting commerce in excess of their normal compensation for the purpose of causing such employee or group or committee directly or indirectly to influence any other employees in the exercise of the right to organize and bargain collectively through representatives of their own choosing; or

(4) to any officer or employee of a labor organization engaged in an industry affecting commerce with intent to influence him in respect to any of his actions, decisions, or duties as a representative of employees or as such officer or employee of such labor organization.

(b)(1) It shall be unlawful for any person to request, demand, receive, or accept, or agree to receive or accept, any payment, loan, or delivery of any money or other thing of value prohibited by subsection (a) of this section.

(2) It shall be unlawful for any labor organization, or for any person acting as an officer, agent, representative, or employee of such labor organization, to demand or accept from the operator of any motor vehicle (as defined in part II of the Interstate Commerce Act) employed in the transportation of property in commerce, or the employer of any such operator, any money or other thing of value payable to such organization or to an officer, agent, representative or employee thereof as a fee or charge for the unloading, or in connection with the unloading, of the cargo of such vehicle: *Provided,* That nothing in this paragraph shall be construed to make unlawful any payment by an employer to any of his employees as compensation for their services as employees.

(c) **Exceptions**

The provisions of this section shall not be applicable .... (5) with respect to money or other thing of value paid to a trust fund established by such representative, for the sole and exclusive benefit of the employees of such employer, and their families and dependents (or of such employees, families, and dependents jointly with the employees of other employers making similar payments, and their families and dependents): *Provided,* That (A) such payments are held in trust for the purpose of paying, either from principal or income or both, for the benefit of employees, their families and dependents, for medical or hospital care, pensions on retirement or death of employees, compensation for injuries or illness resulting from occupational activity or insurance to provide any of the foregoing, or unemployment benefits or life insurance, disability and sickness insurance, or accident insurance; (B) the detailed basis on which such payments are to be made is specified in a written agreement with the employer, and employees and employers are equally represented in the administration of such fund, together with such neutral persons as the representatives of the employers and the representatives of employees may agree upon and in the event the employer and employee groups deadlock on the administration of such fund and there are no neutral persons empowered to break such deadlock, such agreement provides

Seafarers Welfare Plan, the Seafarers Pension Plan, the Seafarers Hiring Hall Trust Fund, the Seafarers Vacation Plan, and the Harry Lundeberg School of Seamanship. Similarly, as part of successive collective bargaining agreements between UIW, on the one hand, and LDC and ACT, on the other, for many years LDC and ACT have been required to contribute and in fact have contributed to the UIW Welfare Plan and the UIW Pension Plan, also labor-management trust funds created pursuant to § 302(c)(5) of the Act. During the many years that ITC, LDC and ACT made regular contributions to the appropriate funds, they did not question the lawfulness of the funds until negotiations in late 1979.

In September, 1979, SIU began negotiations for a successor collective bargaining agreement to replace the existing agreement, which was to expire on December 30, 1979. SIU requested that ITC make increased contributions to the trust funds, but ITC refused. No progress had been made in the negotiations when the existing agreement expired. ITC immediately ceased contributing to the trust funds and later established its own fund for administering employee benefits without union representation or consent. On July 14, 1980, the SIU employees began a strike to compel the Employers to continue contributing to the original funds. There is still no collective bargaining agreement between SIU and ITC.

Contract negotiations between UIW and LDC and ACT also snagged on the issue of employer contributions to their employee trust funds. After the existing agreement expired on August 19, 1981, negotiations ceased. LDC and ACT ceased contributions to the existing trust funds and established their own plans for providing employee benefits without union representation.

The Unions, SIU and UIW, separately filed unfair labor practice charges with the NLRB, claiming, among other things, that their respective Employers' cessation of contributions to the existing employee benefit funds and the establishment of new funds during the collective bargaining process without bargaining to impasse was a refusal to bargain collectively in good faith in violation of § 8(a)(5) of the NLRA, 29 U.S.C. § 158(a)(5). The General Counsel of the NLRB issued unfair labor practice complaints.[2] In each of these NLRB proceedings the employers admitted the facts, but claimed that their acts did not violate the law.

---

that the two groups shall agree on an impartial umpire to decide such dispute, or in event of their failure to agree within a reasonable length of time, an impartial umpire to decide such dispute shall, on petition of either group, be appointed by the district court of the United States for the district where the trust fund has its principal office, and shall also contain provisions for an annual audit of the trust fund, a statement of the results of which shall be available for inspection by interested persons at the principal office of the trust fund and at such other places as may be designated in such written agreement; and (C) such payments as are intended to be used for the purpose of providing pensions or annuities for employees are made to a separate trust which provides that the funds held therein cannot be used for any purpose other than paying such pensions or annuities; (6) with respect to money or other thing of value paid by any employer to a trust fund established by such representative for the purpose of pooled vacation, holiday, severance or similar benefits, or defraying costs of apprenticeship or other training programs: *Provided,*

That the requirements of clause (B) of the proviso to clause (5) of this subsection shall apply to such trust funds;

(d) Any person who willfully violates any of the provisions of this section shall, upon conviction thereof, be guilty of a misdemeanor and be subject to a fine of not more than $10,000 or to imprisonment for not more than one year, or both.

(e) The district courts of the United States and the United States courts of the Territories and possessions shall have jurisdiction, for cause shown, and subject to the provisions of section 381 of Title 28 (relating to notice to opposite party) to restrain violations of this section, without regard to the provisions of section 17 of Title 15 and section 52 of this title, and the provisions of chapter 6 of this title.
29 U.S.C. § 186.

**2.** On behalf of SIU, the General Counsel filed, among others, NLRB Case Nos. 9–CA–15923 and 9–CA–16255. On behalf of UIW, the General Counsel filed NLRB Case Nos. 15–CA–8317 and 15–CA–8489.

On March 13, 1983, Administrative Law Judge (ALJ) Thomas Johnson issued a decision in the unfair labor practice proceedings between SIU and ACBL, ITC and MAC. He found that MAC and ITC had violated their duty to bargain under § 8(a)(5) of the NLRA by unilaterally ceasing to contribute to the SIU-related funds and by implementing their own funds to provide ITC employees with pension benefits. Although he stated that he lacked authority to determine if the SIU-related funds violate § 302, he found the Employers' claim of illegality under § 302 to be "inconsistent with the fact [MAC and ITC] had contributed to those same trust funds for years without questioning their legality or show[ing] any valid reason to question them now." Moreover, the ALJ went on to examine several of the allegations of improprieties in the funds and found them to be either unpersuasive or not supported by any evidence. Based on these findings, the ALJ recommended that the NLRB order MAC and ITC to "restore making contributions to the [SIU-related funds] . . . and pay into the appropriate trust funds all those contributions they have failed to pay since April 6, 1980."

On November 8, 1983, ALJ Linton issued his decision in the UIW proceeding. He also found that the Employers had committed an unfair labor practice under § 8(a)(5) both by ceasing contributions and by establishing its own fund. He likewise recommended that the NLRB order the employers to resume contributions to the original funds, and pay back the sums it would have become liable to pay to the funds since it ceased contributions. ALJ Linton's conclusion in the UIW proceeding was based, at least partly, on his holding that the collective bargaining contract had never expired because of the illegal position taken by the Employer regarding the scope of the bargaining unit. Thus, he found there was no valid impasse.

The Employers filed this action in the District Court on January 8, 1981. In this suit, the Employers seek to enjoin the Unions from making collective bargaining demands and striking in support of demands that the Employers continue contributing to seven labor-management trust funds, and to obtain an award of compensatory damages caused by a past strike in support of such demands. The Employers claim that they are entitled to such injunctive relief under § 302(e) of the Labor-Management Relations Act and to damages based on a judicially-implied cause of action under § 302(e), because *on the face* of the trust documents *and as administered* the trust funds do not comply with certain requirements of § 302(c)(5)–(6) of the Act.

Unions moved to transfer venue to the Eastern District of New York, primarily on the ground that the trust funds were all located in that judicial district. On April 15, 1981, the district court denied the Unions' motion to transfer relying on the Employers' representation that the purpose of this lawsuit is *not* to cure the trust funds' alleged defects, nor to obtain a declaration that the funds either on their face or as administered are invalid. The Employers insisted that this suit focused instead only on injunctive relief from the Unions' insistence to the point of strike during the collective bargaining process that Employers make contributions to the trust.

On April 10, 1981, while the venue motion was under consideration, the Unions moved to dismiss the complaint herein or, alternatively, to stay the prosecution of this lawsuit on three principal grounds. First, the District Court's jurisdiction over this lawsuit is preempted by the NLRB's exclusive jurisdiction over unfair labor practices. Second, even assuming, *arguendo*, that the District Court has jurisdiction, these proceedings should be stayed pending the NLRB's expert determination as to issues which are crucial to this lawsuit and which were then and still are pending before the NLRB. Third, the Employers' request for compensatory damages should be dismissed for failure to state a claim on which relief may be granted, since § 302(e) of the Act does not permit such a remedy and no such remedy should be judicially-implied. In a Memorandum and Order entered on August 20, 1982, the District

Court denied the Unions' motion with respect to the Employers' requests for injunctive relief, but dismissed that portion of the Employers' complaint which sought compensatory damages.

On December 3, 1982, the District Court properly certified its August 20, Order for interlocutory appeal under 28 U.S.C. § 1292(b). On February 10, 1983, this Court granted the Unions' petition for leave to appeal from the August 20, Order.

### Employers' Claim for Damages Under § 302

■ Section 302 of the LMRA, *see supra*, n. 1, generally prohibits payments or loans by employers to employee representatives, to labor organizations, and to employees in excess of their normal compensation. *Snider v. All State Administrators, Inc.*, 481 F.2d 387, 390 (5th Cir.1973). By way of exception, Congress in § 302(c) permitted employer contributions to a few clearly delineated employee benefit programs, including employee pension and welfare trust funds. Section 302(c)(5), (6), however, provides mandatory guidelines for the structure and purpose of these trust funds. *Bricklayers, Masons and Plasterers v. Stuart Plastering Company*, 512 F.2d 1017, 1024 (5th Cir.1975).

■ Section 302(e) provides federal District Courts with jurisdiction "to restrain violations of this section." 29 U.S.C. § 186(e). This language differs markedly from that of §§ 301 and 303 of the LMRA, which speak respectively of "money judgments" and "damages." 29 U.S.C. §§ 185, 187. Accordingly, this Court has consistently held that § 302 provides no private cause of action for damages resulting from violations of § 302. *Bass v. International Brotherhood of Boilermakers*, 630 F.2d 1058, 1067 (5th Cir.1980); *Iron Workers Local No. 272 v. Bowen*, 624 F.2d 1255, 1259 (5th Cir.1980) ("section 302(e) jurisdiction ... does not comprehend claims for damages."); *Mobile Mechanical Contractors Association v. Carlough*, 566 F.2d 1213, 1219 (5th Cir.1977); *Snider*, 481 F.2d at 390 ("district court jurisdiction under

Section 302(e) is limited to restraining future violations of the statute ...").

Several other circuits have reached the same conclusion. *McCaffrey v. Rex Motor Transportation, Inc.*, 672 F.2d 246, 250 (1st Cir.1982); *Sellers v. O'Connell*, 701 F.2d 575, 578 (6th Cir.1983); *Central States v. Admiral Merchants*, 511 F.Supp. 38, 46-47 (D.Minn.1980), *aff'd*, 642 F.2d 1122 (8th Cir.1981); *Souza v. Trustees of Western Conference of Teamsters*, 663 F.2d 942, 945 (9th Cir.1981). Accordingly, the District Court properly dismissed the Employers' claim for damages.

### Injunction Against Strike and Bargaining Demands

#### Mootness

The strike complained of by Employers occurred from July 14, 1980 to September 16, 1980. However, Employers urge that unless the Unions are enjoined from insisting on contributions to the trust funds as a condition to a new collective bargaining agreement, they will likely engage in renewed strike activity. Since 1980, the Unions have not renewed the strikes, but have sought adjudication by the NLRB. An order by the NLRB, enforced by this Court if necessary, would make another strike unlikely, regardless of the outcome in the NLRB proceeding.

■ Although, as explained below, pendency of the NLRB proceeding is relevant to whether this Court should reach the merits of the injunction claim, it does not make the question moot. In *Super Tire Engineering Co. v. McCorkle*, 416 U.S. 115, 94 S.Ct. 1694, 40 L.Ed.2d 1 (1974), the Supreme Court held that an action for injunction against a strike does not require the presence of an active labor dispute so long as the plaintiffs allege the existence of an immediate and definite action or policy that has adversely affected or continues to affect the present interest. The Court pointed out that "the great majority of economic strikes do not last long enough for complete judicial review of the controversies they engender." *Id.* at 126, 94 S.Ct. at

1700. Thus, issues of the propriety of economic strikes are often "capable of repetition, yet evading review." *Id.* at 125, 94 S.Ct. at 1700.

In *Mobile Mechanical Contractors Association v. Carlough,* 566 F.2d 1213, 1217 (5th Cir.1977), this Court distinguished *McCorkle* and held that an employer's claim for an injunction against the strike aimed at compelling the employer to contribute to a fund that allegedly violated § 302(c)(5)(B) of the LMRA was moot. However, events occurring subsequent to the strike, which are absent in this case, were the basis for the mootness. In *Carlough* the trust fund had been amended by agreement to remove the offending provisions. Moreover, several years had elapsed without renewal of demands for the contributions in question. A controlling official of the union testified that the union members would accept his recommendation not to strike for the contributions in the future. 566 F.2d at 1217.

In contrast, the Unions' demands in this case are still being made. The Unions are seeking vindication of these demands and strike by way of the NLRB proceeding in which this issue figures prominently. No agreement has been reached on a collective bargaining agreement since the strike. Thus, the issue remains red hot, and the claim for injunction against the union strike and bargaining demands is not moot.

*"Primary Jurisdiction" of the NLRB*

The Unions contend that the remedy requested by the Employers—an injunction against the strike and collective bargaining demands for contributions to the trust funds—is preempted by the primary jurisdiction of the NLRB over conduct arguably protected or prohibited by § 7 or § 8 of the NLRA under the doctrine of *San Diego Building Trades Council v. Garmon,* 359 U.S. 236, 79 S.Ct. 773, 3 L.Ed.2d 775 (1959).[3] The Employers contend that because the employee trust funds violate the structural requirements of § 302, both on their faces and as administered, the District Court had jurisdiction under § 302(e) "to restrain violations of this section."

A variety of remedies are possible under § 302. It is clear that a District Court has jurisdiction to inquire deep into the structure and administration of a union welfare trust fund into which employers have made contributions, declare the trust invalid under § 302, reform the trust to invalidate illegal provisions, and to enjoin trustees, employers, or union officials from making improper payments into or out of the fund. *Snider v. All State Administrators, Inc.,* 481 F.2d 387, 390 (5th Cir.1973); *Mobile Mechanical Contractors Association v.*

---

3. We define our terms as did the Supreme Court in *Sears, Roebuck & Co. v. Carpenters,* 436 U.S. 180, 199 n. 29, 98 S.Ct. 1745, 1758 n. 29, 56 L.Ed.2d 209 (1978):

In this opinion, the term "primary jurisdiction" is used to refer to the various considerations articulated in *Garmon* and its progeny that militate in favor of pre-empting ... court jurisdiction over activity which is subject to the unfair labor practice jurisdiction of the federal Board. This use of the term should not be confused with the doctrine of primary jurisdiction, which has been described by Professor Davis as follows:

"The precise function of the doctrine of primary jurisdiction is to guide a court in determining whether the court should refrain from exercising its jurisdiction until after an administrative agency has determined some question or some aspect of some question arising in the proceeding before the court.

"The doctrine of primary jurisdiction does not necessarily allocate power between courts and agencies, for it governs only the question whether court or agency will *initially* decide a particular issue, not the question whether court or agency will *finally* decide the issue." 3 K. Davis, Administrative Law Treatise § 19.01, p. 3 (1958) (emphasis in original).

While the considerations underlying *Garmon* are similar to those underlying the primary-jurisdiction doctrine, the consequences of the two doctrines are therefore different. Where applicable, the *Garmon* doctrine completely pre-empts ... court jurisdiction unless the Board determines that the disputed conduct is neither protected nor prohibited by the federal Act.

As our discussion below indicates, our decision relies to some extent on *both* the *Garmon* and the administrative law doctrines of "primary jurisdiction."

*Carlough,* 566 F.2d 1213, 1219 (5th Cir. 1977). 29 U.S.C. § 186(e). Another workable solution was employed in *Quad City Builders Association v. Tri City Bricklayers Union No. 7,* 431 F.2d 999 (8th Cir. 1970). There the Court declared an employee benefit fund invalid under the equal representation provisions of § 302(c), restrained the improper trustees from serving, and instructed the parties to agree on a lawful plan for trustee selection. The Court also held, however, that in the interim, the existing trustees could continue to receive contributions to the fund subject to Court supervision of disbursements. 431 F.2d at 1004. The District of Columbia Circuit cited this practice with approval, because it accords with "the primacy of protection for trust beneficiaries in the congressional scheme.... [and] promotes Congress's interest in a continued flow of benefits." *National Stabilization Agreement v. Commercial Roofing and Sheetmetal,* 655 F.2d 1218, 1227 (D.C.Cir.1981). This Court has also recognized "Congress' intent with respect to existing trust funds to ensure the continued flow of benefits to the trust beneficiaries despite the structural flaws in the trust." [4] *Central Florida Sheet Metal v. N.L.R.B.,* 664 F.2d 489, 498 (5th Cir.1981).

■ This case has been complicated somewhat by the Employers' insistence that they are *not* seeking either reformation of the trust or a declaration of its invalidity,[5] but instead are seeking only an injunction against the Unions' collective bargaining demands for trust contributions and strikes in support of those demands. Such relief would nevertheless necessarily be premised on a holding that the trust funds, either on their face or as administered, are illegal under § 302(c). Only on such basis would the demands for contribution be violative of § 302(a).

In *Garmon,* the Supreme Court held "When an activity is arguably subject to § 7 or § 8 of the [National Labor Relations] Act, the States *as well as the federal courts* must defer to the exclusive competence of the National Labor Relations Board...." 359 U.S. at 245, 79 S.Ct. at 779 (emphasis added). Although the action before the *Garmon* court was brought in state court, the Court's holding extended by its terms [6] and reasoning to federal courts. The purpose of the primary jurisdiction doctrine of *Garmon* was explained in that opinion:

Congress has entrusted administration of the labor policy for the Nation to a centralized administrative agency, armed with its own procedures, and equipped with its specialized knowledge and cumulative experience:

4. Of course, this policy of insuring a continued flow of benefits to the beneficiaries, would not apply to payments if the source of the payments themselves would be illegal, even if the structure and administration of the trust into which they were paid strictly complied with § 302. Thus, the Supreme Court has held that in an action under § 301 by pension fund trustees against an employer to compel payments to the fund, the employer could assert as a defense that the particular payments in issue would be "hot cargo" payments under § 8(e) of the NLRA. *Kaiser Steel Corp. v. Mullins,* 455 U.S. 72, 102 S.Ct. 851, 70 L.Ed.2d 833 (1982). In such case, the employees have no right to the payments, and no amendment of a trust fund or change in its administration could make the payments any less illegal. Thus, a Court may not order the employer to pay. *Id.*

5. This was the basis for the Employers' opposition to the Unions' motion to transfer venue to

New York, where the trusts are located and where the trustees could be joined as parties and subjected to the District Court's injunctive orders.

6. Other language from *Garmon* indicates that the rule referred to federal courts as well:

But *courts* are not primary tribunals to adjudicate such issues. It is essential to the administration of the Act that these determinations be left in the first instance to the National Labor Relations Board. What is *outside the scope of this Court's authority* cannot remain within a State's power and state jurisdiction too must yield to the exclusive primary competence of the Board. See, *e.g., Garner v. Teamsters Union,* 346 U.S. 485 [74 S.Ct. 161, 98 L.Ed. 228], especially at 489–491 [74 S.Ct. at 165–166]; *Weber v. Anheuser-Busch, Inc.,* 348 U.S. 468 [75 S.Ct. 480, 99 L.Ed. 546]. 359 U.S. at 244–45, 98 S.Ct. at 779–80 (emphasis added).

"Congress did not merely lay down a substantive rule of law to be enforced by any tribunal competent to apply law generally to the parties. It went on to confide primary interpretation and application of its rules to a specific and specially constituted tribunal and prescribed a particular procedure for investigation, complaint and notice, and hearing and decision, including judicial relief pending a final administrative order. Congress evidently considered that centralized administration of specially designed procedures was necessary to obtain uniform application of its substantive rules and to avoid these diversities and conflicts likely to result from a variety of local procedures and attitudes towards labor controversies.... A multiplicity of tribunals and a diversity of procedures are quite as apt to produce incompatible or conflicting adjudications as are different rules of substantive law...." *Garner v. Teamsters Union*, 346 U.S. 485, 490–491 [74 S.Ct. 161, 165–166, 98 L.Ed. 228].

359 U.S. at 242–43, 79 S.Ct. at 778–79.

In *Garner v. Teamsters Union*, 346 U.S. 485, 74 S.Ct. 161, 98 L.Ed. 228 (1953), the Supreme Court in an action to enjoin picketing declared:

The same reasoning which prohibits *federal* courts from interfering in such cases, except by way of review or on application of the federal Board, precludes state courts from doing so. *Cf. Myers v. Bethlehem Shipbuilding Corp.*, 303 U.S. 41 [58 S.Ct. 459, 82 L.Ed. 638] [federal court is without jurisdiction to enjoin an NLRB hearing even though it is claimed that the hearing would cause irreparable injury and that interstate commerce is not involved]; *Amalgamated Utility Workers v. Consolidat-*

*ed Edison Co.*, 309 U.S. 261 [60 S.Ct. 561, 84 L.Ed. 738].

346 U.S. at 491, 74 S.Ct. at 166 (emphasis added).

More recently, the Supreme Court has stated that

The Board is vested with primary jurisdiction to determine what is or is not an unfair labor practice. As a general rule, federal courts do not have jurisdiction over activity which "is arguably subject to § 7 or § 8 of the [NLRA]," and they "must defer to the exclusive competence of the National Labor Relations Board." *San Diego Building Trades Council v. Garmon*, 359 U.S. 236, 245 [79 S.Ct. 773, 779, 3 L.Ed.2d 775] (1959). See also *Garner v. Teamsters*, 346 U.S. 485, 490–491 [74 S.Ct. 161, 165–166, 98 L.Ed. 228] (1953).

*Kaiser Steel Corp. v. Mullins*, 455 U.S. 72, 83, 102 S.Ct. 851, 859, 70 L.Ed.2d 833 (1982). The *Kaiser* Court held that a District Court in a § 301 action by trustees to enforce an agreement to contribute to employee funds must refrain from enforcing a contract provision that violates the "hot cargo" provision, § 8(e), of the NLRA. However, the Court limited its holding[7] to a passive remedy by stating that "only the Board may provide *affirmative remedies* for unfair labor practices...." 455 U.S. at 86, 102 S.Ct. at 860 (emphasis added). Of course, the injunction the Employers seek in this case requires affirmative action.

The activities complained of in this suit are "arguably subject to § 7 or § 8 of the NLRA." The Employers have insisted on not seeking any judicial action directed at the trustee selection process or any manner of disbursing the funds; the activity the Employers complain of is the past and threatened strike and the related collective

---

7. The *Kaiser* Court further limited its holding by stating that "the major purpose of prohibiting hot cargo agreements is to protect employers...." 455 U.S. at 78, 102 S.Ct. at 856. In contrast, the primary intended beneficiaries of § 302 are the employees. *See, e.g., Bricklayers, Masons and Plasterers v. Stuart Plastering Com-*

*pany,* 512 F.2d 1017, 1025 (5th Cir.1975) ("The objective of this legislation was to guarantee that payments made by employers were used to provide employees with the benefits to which they were entitled under a collective bargaining agreement.")

bargaining demands.[8] This Court recently held that a peaceful strike to compel an employer to agree to make contributions to an employee trust fund that allegedly violates § 302 is activity that is either prohibited or protected by § 7 or § 8 of the NLRA and thus preempted under the *Garmon* doctrine. *Mobile Mechanical Contractors Association v. Carlough*, 664 F.2d 481, 487, 488 n. 10 (5th Cir.1981).

The reasoning of the *Carlough* Court,[9] along with its companion case, *Central Florida Sheet Metal v. N.L.R.B.*, 664 F.2d 489 (5th Cir.1981), is straightforward.

> The proper focus of our preemption analysis is thus whether the strike to obtain the trust fund is arguably protected or prohibited by the Act.
>
> Board decisions establish that a strike to obtain the trust fund is quite literally either protected or prohibited activity under the *Garmon* standard
>
> \*   \*   \*   \*   \*   \*

In *Central Florida*, 234 NLRB 1238 (1978), the Board rejected the contention of an employer association that the union's insistence on the trust fund was a nonmandatory subject of bargaining. The Board's decision rested largely on its conclusion that it lacked jurisdiction to determine the legality of the trust fund under § 302. This conclusion does not mean, however, that the Board lacks jurisdiction to determine whether a union may strike to obtain the trust fund. Indeed, the Board in *Central Florida* concluded that the trust fund was a mandatory subject of bargaining. *See id.* Strikes over mandatory subjects of bargaining are, of course, protected activity under § 7, *NLRB v. Erie Resistor Corp.*,

373 U.S. 221, 233–34, 83 S.Ct. 1139, 1148–49, 10 L.Ed.2d 308 (1963), and are entitled to preemptive protection. *Garmon, supra.*

In a supporting footnote the *Carlough* court explained:

> Our holding today in *Central Florida*, which affirms the Board's decision but which refines its rationale, does not compel a different conclusion. We find in *Central Florida* that the Board's construction of § 8(b)(3) of the National Labor Relations Act, which permits bargaining in good faith to include bargaining to impasse for a trust fund that *facially* comports with § 302 of the Labor Management Relations Act, is reasonable and consonant with overall federal labor policy. Thus, the Board properly exercised its own jurisdiction to determine that the strike was protected by § 7.

664 F.2d at 487–88 & n. 10 (emphasis added).

A full understanding of that reasoning in *Carlough* and the limits of its applicability to facial review under § 302 requires an understanding of our holding in the companion case, *Central Florida Sheet Metal v. N.L.R.B.*, 664 F.2d 489 (5th Cir.1981). The facts giving rise to those cases are virtually identical to those in this case. After the union's contract expired, negotiations for a new contract included a union demand that the employers contribute to an employee benefit fund. The employers refused, contending that the trust violated § 302. The employees struck to compel agreement to make contributions. The employer then sought relief from the strike by

---

8. In opposing the Unions' motion to dismiss, the Employers argued:

    Here, we are *not* asking the Court to rewrite the trust documents nor to remedy violations of fiduciary obligations or standards of prudence in the administration of trust funds.

    \*   \*   \*   \*   \*   \*

    Here, plaintiffs seek to *restrain demands* that they contribute to the trust funds that are administered in violation of section 302. Plaintiffs do not seek federal management of the trust funds, but simply seek to be relieved

    from defendants' unlawful demands and strikes that plaintiff contribute.

9. Although the exact question before us—whether a District Court under § 302(e) may enjoin a strike to compel contributions to a trust allegedly violating § 302(c) where the NLRB has taken jurisdiction of the controversy—was moot in *Carlough*, 664 F.2d at 499 n. 14, the *Carlough* analysis of preemption of a state law claim for damages from the strike provides sufficient analysis to answer the question.

instituting proceedings both before the NLRB (the *Central Florida* case) and in federal court (the *Carlough* case). Before the Board, the employer argued that the union, in bargaining to impasse and striking over an illegal contract provision, was committing an unfair labor practice under § 8(b)(3) by refusing to bargain in good faith.[10]

The NLRB examined the trust documents *on their face only.* The Board held that because the trusts were not invalid on their face, and there was no prior judicial declaration of their invalidity, the strike by the union was not a refusal to bargain in good faith under § 8(b)(3), even though the validity of the trusts *as administered* was not considered.

On review, this Court affirmed the NLRB's refusal to issue a cease-and-desist order against the strike. We held that the NLRB had jurisdiction to judge the facial validity under § 302 of the trusts. We reasoned that the NLRB could reasonably define refusals to bargain in good faith under § 8(b)(3) as not including strikes to compel contributions to facially-valid trusts. Thus, we approved the NLRB's chosen policy of allowing strikes for contributions to employee trusts that the employer alleges to be invalid under § 302 where: (1) the trusts are not invalid on their face, and (2) there has been no prior judicial declaration that the trusts are invalid. *Id.* at 500.

As explained above, in this case the NLRB has taken jurisdiction of two unfair labor practice proceedings, each involving the same issue as is before us. The General Counsel has charged that the Employers refused to bargain in good faith in violation of § 8(a)(5) by ceasing contributions to the funds without bargaining to impasse and by establishing their own funds without any union representation. Under the *Central Florida* case, the NLRB may sustain these charges if the trusts are valid on their face. *See N.L.R.B. v. Haberman Construction Company,* 641 F.2d 351, 357 (5th Cir.1981) (en banc) *and Producers Dairy Delivery v. Western Conference,* 654 F.2d 625 (9th Cir.1981) (during negotiations following the expiration of a collective bargaining contract, the employer is required to maintain the status quo as to wages and working conditions, including contributions to pension funds, until there is an impasse). If the trusts are held by the NLRB to be valid on their face, then the strikes are protected by § 7 of the NLRA where, as here, the Employers have not obtained a judicial declaration of their invalidity. *Carlough,* 664 F.2d at 488 n. 10.

On the other hand, if the NLRB finds that the trusts are invalid on their face, this would dispose of the charges against the Employers. This is because an employer is not required to bargain to impasse under § 8(a)(5) over the inclusion of an illegal provision in a collective bargaining contract. *See Central Florida,* 664 F.2d at 496; *Associated General Contractors v. N.L.R.B.,* 465 F.2d 327, 334 (7th Cir.1972), *cert. denied* 409 U.S. 1108, 93 S.Ct. 907, 34 L.Ed.2d 689 (1973). Thus, the decision of the NLRB can possibly dispose of the claim before us.

In any event, the NLRB's ruling should provide us with the NLRB's views on the timing and manner in which the parties should raise the § 302 claims so as not to interfere unduly with the overall statutory and administrative scheme for collective bargaining. In seeking the views of the NLRB on the most orderly method of en-

---

10. In *Central Florida,* we explained:

Sections 8(a) and (b) respectively define employer and union unfair labor practices. In addition to prohibiting specific acts § 8 also incorporates the rights and requirements of §§ 7 and 9 of the NLRA, 29 U.S.C. §§ 157 and 159. Section 8(b)(3) makes it an unfair labor practice for a union to refuse to bargain collectively with an employer representative who has a concomitant duty to bargain under § 8(a)(5). Section 8(d) defines collective bargaining as meeting and conferring in good faith with respect to "wages, hours and other terms and conditions of employment," the so-called mandatory subjects of bargaining.....  Striking for an illegal contract provision is a refusal to bargain in good faith

664 F.2d at 496.

forcing § 302 against strikes in the collective bargaining negotiations, and in postponing any ruling on nonfacial, administrative violations, we rely on the administrative law concept of "primary jurisdiction." *See supra* note 1; K. Davis, Administrative Law Treatise § 22.1. The Supreme Court aptly explained this doctrine in *United States v. Western Pacific Railroad Company*, 352 U.S. 59, 77 S.Ct. 161, 1 L.Ed.2d 126 (1956):

> "Primary jurisdiction" ... applies where a claim is originally cognizable in the courts, and comes into play whenever enforcement of the claim requires the resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative body; in such a case the judicial process is suspended pending referral of such issues to the administrative body for its views.

*Id.* at 63–64, 77 S.Ct. at 164–165. *See also United Gas Improvement Co. v. Continental Oil Co. ("Rayne Field")*, 381 U.S. 392, 85 S.Ct. 1517, 14 L.Ed.2d 466 (1965). This Court, following the Supreme Court's lead, has invoked the principle of primary jurisdiction within a variety of contexts [11] when faced with "an agency statutorily invested with responsibility for the determination and effectuation of policy with the given field which will be affected or influenced by, or influence, the issue posed for Court determination." *American Trucking Association v. I.C.C.*, 682 F.2d 487, 491–92 (5th Cir.1982) *quoting Usery v. Tamiami Trail Tours, Inc.*, 531 F.2d 224, 243 (5th Cir.1976).

In *Boire v. International Brotherhood of Teamsters*, 479 F.2d 778 (5th Cir.1973), this Court emphasized that the NLRB should be accorded the opportunity to pass initially on questions involving the construction of the NLRA. *Id.* at 789. Invoking primary jurisdiction is particularly appropriate here, where proceedings based on the same controversy are pending before the NLRB. *See American Trucking Association, Inc. v. I.C.C.*, 682 F.2d 487, 492 (5th Cir.1982); *Tenneco Oil Co. v. F.E.R.C.*, 580 F.2d 722 (5th Cir.1978); *Mississippi Power & Light Co. v. United Gas Pipe Line*, 532 F.2d 412, 420 (5th Cir.1976). The NLRB is in the best position to view the agreement to contribute,[12] a § 302 violation, the strike to compel contributions, and the Employers' establishment of its own fund, not each in an isolated analysis under § 302, but against the backdrop of the entire collective bargaining process, of which the § 302 charge has become a part because of the relief requested.

The nature of the relief sought is a relevant consideration in deciding whether to refer to an agency. *Mississippi Power & Light Co.*, 532 F.2d at 419. The relief sought in this case—an injunction against strikes and bargaining demands—would suspend the collective bargaining process, without resolving the alleged illegalities in the trust so that bargaining could continue. Moreover, the NLRB has considerable discretion in deciding on the appropriate remedy for a particular unfair labor practice. *E.g., Shepard v. N.L.R.B.*, 459 U.S. 344, 103 S.Ct. 665, 669, 74 L.Ed.2d 523 (1983); *N.L.R.B. v. Gissel Packing Co.*, 395 U.S.

---

**11.** *See Usery v. Tamiami Trail Tours, Inc.*, 531 F.2d 224 (5th Cir.1976); (Brown, C.J., concurring, suggesting the use of primary jurisdiction); *Geisser v. United States*, 513 F.2d 862 (5th Cir.1975) (analogizing to the use of primary jurisdiction); *Mobil Oil Corp. v. Oil Chemical and Atomic Workers International Union*, 504 F.2d 272 (5th Cir.1974) (en banc) (Brown, C.J., dissenting for failure to invoke primary jurisdiction), *rev'd*, 426 U.S. 407, 96 S.Ct. 2140, 48 L.Ed.2d 736 (1976); *International Paper Co. v. Federal Power Commission*, 476 F.2d 121 (5th Cir.1973) (Brown, C.J., concurring); *J.M. Huber Corp. v. Denman*, 367 F.2d 104 (5th Cir.1966); *Weymouth v. Colorado*

*Interstate Gas Co.*, 367 F.2d 84 (5th Cir.1966); *Carter v. American Telephone & Telegraph Co.*, 365 F.2d 486 (5th Cir.1966), *cert. denied*, 385 U.S. 1008, 87 S.Ct. 714, 17 L.Ed.2d 546 (1967); *Agricultural Transportation Association of Texas v. King*, 349 F.2d 873 (5th Cir. 1965); *Louisville & Nashville R.R. v. Knox Homes Corp.*, 343 F.2d 887 (5th Cir.1965).

**12.** We do not imply that a fund that is illegal under § 302 may be justified or cured through an estoppel argument based on the employer's acquiescence in the past. *See Kaiser*, 455 U.S. at 81 n. 6, 102 S.Ct. at 858 n. 6.

575, 612, n. 32, 89 S.Ct. 1918, 1939, n. 32, 23 L.Ed.2d 547 (1969). If the NLRB finds facial invalidity, it has the power to issue a cease-and-desist order against the strike and to enjoin payments. *Central Florida,* 664 F.2d at 498. Although only a District Court can eliminate the invalid provisions, the NLRB may, if it deems appropriate, order the parties to bargain to impasse on contributions to a different or altered trust fund, which they may devise in conformity with § 302.

We do not imply that a District Court never has jurisdiction to rule on the *facial* validity of a trust under § 302, or to restrain violations even where neither party has resorted to the NLRB. Section 302(e) plainly gives this power to federal courts. However, when, as here, the only relief requested is an injunction against bargaining demands and strikes, activities subject to § 7 and § 8 of the NLRA, the *Garmon* doctrine of primary jurisdiction calls for the court to defer to the NLRB's jurisdiction. Thus, we remand with directions that the District Court stay further action in this proceeding.

After the NLRB has ruled and given its views of the best method of reconciling District Court jurisdiction over § 302 claims with requests under § 302 for remedies affecting collective bargaining, the District Court will be in a position to decide if there is any basis for further proceedings in this case.[13] Whatever issues remained at that time as to possible District Court jurisdiction over illegalities in *administration* of the trusts, not on their face, could be limited by summary judgment proceedings in which appropriate documentary materials would disclose whether there actually remains any material issue of fact.

Accordingly, we affirm the dismissal of the claim for damages, and hold that the

District Court should defer decision on the motion to dismiss until the NLRB ruling on this issue has become final.[14] The action should be stayed until such time.

AFFIRMED IN PART; MODIFIED AND AFFIRMED IN PART.

---

**13.**· At that point, a substantial question may arise whether the relief sought by the Employers could be granted if the trustees are not parties to the action. *See Warshaw v. Local No. 415,* 325 F.2d 143 (5th Cir.1963).

**14.** The stay we order shall extend until all petitions for review of the NLRB's ruling on this issue are exhausted or until the time periods for filing such appeals has run.

The parties are instructed to inform the NLRB of our decision without delay.